## DAVID B. WHIMSTER, Respondent, v. CONWAY F. HOLMES, Appellant.

### Kansas City Court of Appeals, February 16, 1914.

1. **NEGLIGENCE: Master and Servant: Scope of Employment.** A chauffeur in the employ of the owner of an automobile who was going away for a few weeks took him to the railway station when the owner directed him to take two friends to their places of business and then to go home and put away the machine. He had before directed him to overhaul the machine during his absence and to consult a certain expert in doing it. The chauffeur dropped the friends as ordered. He then waited at the owner's place of business for near three hours for his pay check and then started for a public garage where the expert was, going by a saloon where he got a drink of liquor. After conferring with the expert and getting another drink, he went to his own home near-by, for supper. After supper he went back to the garage, picked up the expert and took him home, getting another drink on the way. After he put down the expert he proceeded towards the owner's home for the purpose of putting up the machine, but when he got nearly there he discovered he had lost his keys to the garage. He thereupon turned to go back to the public garage where he had consulted with the expert and on the way negligently ran down a pedestrian in the street. *Held*, that the owner was liable for the injury.

2. ———: ———: **Unusual Direction: Servant's Purpose.** Though a servant delays in the execution of his master's orders, or attempts to execute it by going in an unusual direction, for a purpose of his own, or violates the master's orders, yet if in pursuit of the business, he was ordered to perform, he commits an injury through negligence, the master is liable. [Cases distinguished.]

3. ———: **Chauffeur's Duty: Lost Keys to Garage.** If in executing the master's business by taking his automobile to the garage of the master the chauffeur discovers he has lost the keys to the garage, he is still in the master's business and in the scope of his employment in turning back to recover the keys.

4. ———: ———: **Frolic: Liability.** If a chauffeur, without the owner's knowledge or consent, takes an automobile on a jaunt or frolic of his own, he is not in the owner's service and the latter is not liable for his negligence.

5. **EVIDENCE: Number of Car: Registration.** Evidence of the number of an automobile and the registration of that number at the license office showing it to belong to a certain named person, is a prima-facie showing of the ownership of the machine.

6. ———: **Second Collision.** If a chauffeur starts with the master's machine in service of the master, and negligently runs down a pedestrian and then, to escape arrest or recognition, speeds away, and at a distance of a mile or more negligently collides with another machine, he is not serving the master at the time of the second collision and the master is not liable for it.

7. **EVIDENCE: Hearsay.** Evidence of what a chauffeur said during the course of the afternoon, in running the owner's automobile as to his using it for his own purpose and not his master's, is hearsay and is not admissible.

8. ———: **Presumptions: Evidence of Fact: Error.** Where in the trial of a case evidence of the scope of the servant's employment is heard, it is error to instruct the jury as to presumptions in favor of the plaintiff that the servant was acting within the scope of his employment. If there is evidence of the fact, there is no room for presumptions.

Appeal from Jackson Circuit Court.—*Hon. D. E. Bird,* Judge.

REVERSED AND REMANDED.

*Rosenberger & Reed* for appellant.

*Hogsett & Boyle* for respondent.

ELLISON, P. J.—Plaintiff's action is for personal injury received in a collision with defendant's automobile which was being driven by his chauffeur. The judgment in the trial court was for the plaintiff.

It appears that defendant was the owner of an automobile car, and that he had a man named Hettenbaugh in charge of it as chauffeur and repairer, and that he kept it in a garage at his residence in Kansas City. Hettenbaugh did not live with defendant, but had a home of his own more than a mile away. On the

afternoon of the 10th day of July, 1910, defendant, intending to be absent from the city for several days, had this chauffeur to drive him to the railway station on the north side of the city, arriving there about 1:30 p. m.   He testified that when he alighted he directed the chauffeur to take two friends of defendant's up into the business part of the city and then to take the car home and put it in the garage.   And it was further shown that he was to overhaul the car and make some repairs during the absence of defendant, consulting with an expert in a certain public garage in the city.

It appears that after taking these friends as ordered, he did not proceed directly home to the garage.   He was shown to be at various places until at about 7:30 p. m. he ran over the plaintiff at Nineteenth and Grand avenue; and finally had a head end collision with a machine on the southern outskirts of the city.   It is insisted by defendant that as a matter of law the chauffeur was not acting in the scope of his employment when he ran over plaintiff.   We think this insistence is not sustained by law or fact and that this case was properly left to the jury.   This is the substance of the testimony of the chauffeur as to his whereabouts:   After stating that he left one of defendant's friends by the way, he left the other at the Baltimore Hotel and then drove over to the office building in which was the Pioneer Trust Company and of which defendant was an officer and waited for his pay check until 3:30.   He then went two or more blocks to a laundry office for his collars.   He then drove by a saloon on his way to Thirty-fourth and Broadway (a distance between twenty-five and thirty blocks) to the public garage kept by the agents for his make of machine, for the purpose of getting advice from Rogers, an expert, concerning the overhauling of the machine, as had been directed by defendant.   Rogers got in and they drove around to determine what the machine needed.   He returned Rogers to the garage and, his

home being in that part of the city, he went there for his supper. After supper he drove back to the public garage and took Rogers home. After dropping Rogers, which, according to the latter's testimony was near seven o'clock, he started for the garage at defendant's home to put the car away. But, as stated by him, when "I got nearly to the place I missed my keys (to the garage and the car) and whether I left them one place or another I don't know, and never found them and haven't found them yet." He testified that "I went back to the garage and looked for my keys there and they were gone. Further than that I cannot remember." He stated that he "had a faint recollection of running into a man at Fifty-second and Oak (on the outskirts of the city). And "the next thing I can remember was that I woke up in the police station."

Rogers's testimony tended to show that Hettenbaugh and he got a drink of liquor at Westport when on their first drive and at fifteenth street and Grand avenue when he was being taken home. Whether Hettenbaugh had liquor with him at this time is not clear, but it is certain, that after he left Rogers, and started home to put up the machine he became so far under the influence of liquor as to be drunk. It was at this time, which must have been about seven o'clock, when he was getting near defendant's home, that he missed his keys and couldn't think "whether he left them at one place or another;" and he "went *back* to the garage" and looked for them. Manifestly, he went back to the garage at Thirty-fourth and Broadway where he had been to consult Rogers and where he had gotten out of the machine.

We have had two purposes in this recitation of matters which the evidence tended to prove. One, to meet defendant's point that Hettenbaugh, as a matter of law, was not engaged in the course of his employment in thus going about after he left defendant at

the station; and the other, that there was no evidence that it was defendant's machine which ran over plaintiff. We need not discuss the latter in detail. The case is too clear to require that. The time of the collision at Nineteenth and Grand avenue was 7:30 p. m. He was shown to be in parts of the city where he might well have been at that place at that time. But the number of his machine was taken by several persons as he sped rapidly away. This, with the certificate of registration showing that number to be defendant's machine, was sufficient to justify a finding that the machine was defendant's. [Trombley v. Stevens Durea Co., 206 Mass. 516.]

On the first proposition, Hettenbaugh's employment was to take the machine back from the station to defendant's home and put it away, and to consult as to repairs with Rogers at the garage. If he had gone directly home and on the way had carelessly run over a pedestrian, no serious question could have been raised as to the course of his employment. But because there was delay in his reaching home, and because he went to other places and stopped on the way and took drinks of liquor, it is said, in effect, his course of employment ceased. That is little short of a statement that so long as an employee keeps within the orders of his employer he is in line of his employment, but so soon as he violates an order he is out of it. That would come near meaning that no liability would be incurred by an employer for the wrong of his servant unless he ordered him to commit the wrong. It was a part of the chauffeur's service to take the machine home and that he was slow about it, or went in indirect ways does not alter the matter so long as he was in pursuit of that object. So it was a part of his service to take the advice of Rogers as to repairs and the same remark will apply to going to see him. As we have said, there was evidence tending to prove (and since the verdict we must look alone to

evidence in plaintiff's behalf) that he had nearly reached home when he turned back to find his keys, and it was after turning back that he ran over plain-tiff, but that circumstance did not throw him out of the scope of his employment. If he lost his keys it was his duty to go back and get them.

There was evidence tending to show that bottles of liquor were found in the machine and that other persons, women and men, were seen in it; and this leads defendant to say that his chauffeur was bent on his own pleasure in what has grown to be known as "joy riding." Maybe he was disregarding his duty to defendant, certainly he was in running over plaintiff, but that is no defense, so long as he was prosecuting defendant's business in getting the car home. If an employer puts an engineer in the cab of a steam engine, or a driver at the wheel of an automobile and starts him out with either of these agencies, he is responsible for what that servant does in the way of negligence in running it for the purpose directed. It is no excuse for the employer to say he became intoxicated and I ordered him to keep sober, or that he drove fast when I directed him to go slowly, or that he went an indirect way when I required that he go directly; provided, of course, he is engaged in accomplishing the service he set out to perform. .

We recognize it as law that the owner of a machine would not be liable for the chauffeur's conduct if the latter took the machine without the owner's knowledge and went "on a frolic of his own," alone or with others. Nor are we unmindful that a servant may start in a matter as the servant of an employer and then abandon his service. Thus he may conceive the notion of stealing the owner's machine and in his effort to escape with it, he may injure another. In that case there would not be liability. Or while in the scope of his employment, he may injure a person and then, as in this case, speed away to escape arrest or

recognition and in doing so injure a second person, the master would not be liable; for, there is a clear abandonment of service and individual action and responsibility set in.

But there was evidence tending to show that there was no abandonment of service by Hettenbaugh in this case, until after plaintiff's injury. His double effort to consult with Rogers and to get the car home was continuous, so far as is shown, unless it be when he was taking Rogers home. And allowing that it ceased then it was undoubtedly resumed so far as getting the car home was concerned, when he left Rogers. [Varneman v. Laundry Co., 166 Mo. App. 685, 692.]

Defendant has cited us to McCarthy v. Timmons, 178 Mass. 378; Lotz v. Hanlon, 217 Pa. 339; Steffen v. McNaughton, 142 Wis. 49; Danforth v. Fischer, 75 N. H. 111, and Colwell v. Aetna Bottle Co., 33 R. I. 531. Except the first, neither of these is in point. In Lotz v. Hanlon the owner of the automobile was absent from the country and the chauffeur, without leave, took a specially invited party of friends for a pleasure ride, when he ran a man down in the street. He had in mind to stop at a store to get some machine supplies, but these were merely incidental and for his own convenience, and he had never been allowed to go there in the machine. That case, of course, is nothing like this. Steffen v. McNaughton was where the chauffeur lived apart from the owner and his employment did not include the time he went to his meals. He walked to his meals except a few times he took the machine without the owner's knowledge. At one of these times he ran over a woman in the street and it was held that, not being then in the owner's service or working in the course of his employment, the owner was not liable. That case has no facts in common with this. In Danforth v. Fisher, the chauffeur was awaiting the owner at his store. The owner directed him to go to his boarding house for his supper and

then come to the City Hotel at a quarter before seven o'clock. He went for his supper, and then, instead of going to the hotel, went off in an opposite direction to another village to visit a friend. On his return from the visit, while on his way to the hotel, he ran against the plaintiff's horse, and it was held the owner was not liable. That case is also unlike this. The last of the above cases is in no way similar to this. There, on arriving at the garage, it was the chauffeur's duty to wash the car and put it away for the night. Instead of putting it away, he, without permission and against the owner's orders, took another employee home and on his return collided with another machine, and the owner was held not liable.

But we concede that in the first of these cases the Supreme Court of Massachusetts supports defendant's view. There the defendant's carriage team ran away and collided with the plaintiff's wagon. One Scott was plaintiff's driver and his business was to stand with the team near the corner of a street in Boston and solicit passengers. About six o'clock on the afternoon of the accident, he was directed by the superintendent to take the team to the owner's stable, distant about a mile and a half. Scott started but did not go by the most direct route and on his way went into a saloon to get a drink of whiskey, leaving his team unhitched. He was gone about three minutes, but in that time his horses became frightened and ran away, colliding with a wagon and injuring the occupant. It was held the master was not liable. In view of the fact that Scott was taking the team to the stable in obedience to orders and was on his way, we cannot reconcile that case with our conception of the law.

Afterwards a case very much like McCarthy v. Timmons came before that court (Hays v. Wilkins, 194 Mass. 223) in which it seems to us that an entirely opposing view was taken. There the driver after having completed his day's work was on his way with his

horse and wagon to the owner's stable by a route a little longer than another. He stopped at a pool room to get some tobacco, leaving his horse unhitched and while in the pool room making his purchase his horse ran away and ran over the plaintiff. The trial court, under the McCarthy case, ruled there was no liability. But the Supreme Court set it aside, holding that while his going into the pool room was not in the scope of his employment, yet the care of his horse was in that scope and he was guilty of negligence in leaving the horse unhitched and unattended. We do not refer to this case as an authority in the case before us, for it was decided from a standpoint making it perhaps inapplicable to the facts in this case. But we have referred to it for the purpose of destroying the McCarthy case as an authority for defendant.

There seems abundant authority to support the views we have expressed in favor of plaintiff's case. The following rule is stated in Richie v. Waller, 63 Conn. 155: "In cases of deviation the authorities are clearly to the effect that a mere departure by the servant from the strict course of his duty, even for a purpose of his own, will not in and of itself be such a departure from the master's business as to relieve him of responsibility." And "if the servant in going *extra viam* is really engaged in the execution of the master's business within the scope of his employment, it is immaterial that he joined with this some private business or purpose of his own. Thus in Patten v. Rea, 2 Com. Bench (N. S.), 605, the servant started out on business of the master, and also to see a doctor on his own account. While on his way to see the doctor he negligently drove against a horse and killed it, and the master was held responsible."

The facts in that case were that a farmer had twice a week, for some years, gotten manure for his farm from a brewery in a near by city. He hired a farm laborer and went with him with a team and

wagon one trip for a load of manure for the purpose of showing him the way so that he might get it himself, but gave no specific directions as to the route which should be taken in the future. On the day of the injury the farmer ordered the man to go for a load and the latter did so. In returning with the load he went out of the usual way so as to go by a shoemaker's shop to see about mending his shoes. He was in the shop for near five minutes and during his absence the team started up the street and collided with another wagon injuring the owner. The court held the laborer was in the service of the farmer at the time of the accident and sustained a judgment against the latter.

Interesting instances arising in other cases are referred to in that case. Thus in Sleath v. Wilson, 9 Car. & Payne, 607, the master was held liable for the negligent act of his servant, who, after having set the master down, drove around to deliver a parcel of his own and did not drive directly where he had been ordered to go. In Whatman v. Pearson, L. R. 3 Com. Pleas, 422, the servant with the horse and cart of the master, contrary to express orders went a quarter of a mile out of his way purely for a purpose of his own, and the master was held responsible. In Mitchell v. Crassweller, 13 Com. Bench, 237, the master was said to be "liable even though the servant in the performance of his duty is guilty of a deviation, or a failure to perform it in the strictest and most convenient manner."

In Quinn v. Power, 87 N. Y. 535, a boatman requested the pilot of a ferry boat to be put aboard of a canal boat out in the stream. The pilot, without compensation, and in mere good nature consented, and in doing so diverged from his usual course in crossing and collided with another boat. The owner of the ferry was held liable. The defense was that the servants on the ferry were not acting within the scope of their employment. Of this the court said: "We do

not concur in this view of the transaction. At the most it appears to us a case where the servant, while acting in the master's business, and within the scope of his employment, deviated from the line of duty to his master and disobeyed his instructions.

"When this ferry boat left the dock at Athens it started for its terminus at Hudson. It took freight and passengers to transfer across the river. Servants and boat, as the latter moved out into the river, were doing the master's business and acting both in the line of duty and of employment. There was a usual track or route by which the boat crossed. It may even have been selected and dictated by the owner. In deviating from it the servants might disregard the instructions of the master, but they were none the less engaged in the master's business of transporting passengers from Athens to Hudson because they did not follow the usual route, or pursued another or even a forbidden track. They were still doing their employer's work, though in a manner contrary to his instructions. If they stopped the boat in the middle of the river they did not cease to be engaged in the master's business. Even if the motive was some purpose of their own, they were still about their usual employment, although pursuing it in a way and manner to subserve also such purpose. When they took this passenger to the tow, and in so doing deviated from the usual route, and stopped the boat midriver for that reason, they were still engaged in the master's business of transporting freight and passengers across the river. They were doing it in a mode and manner perhaps not authorized, and possibly, in some sense, to effect a purpose of their own, but none the less acting within the scope of their employment and engaged in the master's business."

In this State the rule that a deviation from the usual manner of service for the individual purpose of the servant will relieve the master, does not obtain. The test here is whether the servant is, at the time of

the misfeasance, engaged in carrying on his service to
the master; if he is, the latter is liable, though the
servant may have deviated from the usual course,
*extra viam,* for purposes of his own, even against his
master's orders. [Garretzen v. Duenckel, 50 Mo. 104;
Evans v. Dyke Automobile Co., 121 Mo. App. 266.] In
the latter case Judge Goode quotes from the former
the following (italics ours): "If the act was done
while the servant was at *liberty* from his service and
pursuing his own ends *exclusively,* there can be no
question that the master is not responsible; even
though the injuries complained of could not be com-
mitted without the facilities afforded by the servant's
relations to his master." Under the rule thus stated,
the St. Louis Court of Appeals held that, conceding an
automobile had been delivered to the defendant's sales-
man at its garage in the city of St. Louis, yet im-
mediately taken back home by the party bringing it,
at the suggestion of the salesman, who proposed call-
ing for it next day (Sunday) to show to a prospective
buyer, the salesman did call and take it out and while
driving about for his own pleasure and not for pur-
pose of selling it, demolished it by colliding with a
streetcar, the automobile company was not liable for
the act of the salesman in destroying the machine."
The rule thus stated was, in effect, announced in Daily
v. Maxwell, 152 Mo. App. 415, 426, as that the owner
could not be held "except it be shown that the person
in charge not only was the agent or servant of the
owner but also was engaged at the time in the business
of his service."

So after all, as stated in Evans v. Dyke Automo-
bile Co. and Ritchie v. Waller, *supra,* the question is
one of fact. The facts may occasionally appear so
clearly as to justify the court in declaring on them as
a matter of law; but oftener they are matters of sharp
dispute and very difficult of solution.

Applying our view of the law to this case, viz., that a deviation from the usual manner of service, or delay in performance of it, or disobeying orders in performing it, are not sufficient to relieve defendant; we state the real question to be, was the chauffeur in the course of performing service for defendant when he committed the wrongful act? Or was he on a jaunt of his own, not connected with that service when he collided with plaintiff? Our answer is that there was evidence tending to prove he was at that time engaged in such service.

In thus stating our conclusion we have not passed unnoticed defendant's suggestions upon the burden of proof, presumptions, etc. Our position on the sufficiency of the evidence to uphold the verdict is based on the whole record giving plaintiff, as we must, the benefit of everything, including reasonable inferences, which tend to support it. The criticism we have of defendant's position is that it is largely drawn from evidence in his favor. After verdict, so long as any substantial evidence is found in plaintiff's favor, it is of little concern what defendant may have shown.

During the trial defendant offered to prove that the chauffeur had stated that afternoon that defendant was out of town and that he was going to use the automobile for his own purposes, pleasure and convenience. This offer was properly refused. The evidence was hearsay and no condition, or situation, existed justifying its admission under any exception to the rule excluding that class of evidence. The chauffeur was a witness for defendant at the trial. It seems singular that if defendant thought such evidence proper he did not examine him on the subject. It has been ruled from necessity, in some instances, where a conspiracy, plan or design was in question, that what one said was admissible. Generally, when this is a person other than the party litigant, and his design is under investigation, he is dead or not to be

found. We know of no case in instances like the present, where such evidence has been considered to be proper. The contrary is ruled. [Gibony v. Foster, 230 Mo. l. c. 136; Connell v. Ry. Co., 123 Mo. App. l. c. 444.]

In State v. Levy, 90 Mo. App. l. c. 646, it is said that: "Our law does, indeed, define some exceptional circumstances which raise hearsay to the rank of admissible evidence. Those exceptions are vindicated by necessity, or by reasons of public policy."

In Truesdail v. Sanderson, 33 Mo. 532, the Supreme Court said: "The court below properly excluded Fields' testimony of statements made by Myerson. They were hearsay merely, and nothing is shown to justify their introduction. For anything that appears in the record, Myerson was himself a competent and available witness. It was proper to exclude testimony by another of his statements."

In the case of Wood v. Hicks, 36 Mo. 326, the Supreme Court held that the statements made by one who was himself a competent witness were not admissible in evidence.

In Langsdorf v. Rosenstein, 36 Mo. 440, the Supreme Court held that the statements of one who was a competent witness at the trial were hearsay and not admissible in evidence.

Objections made to exclusions of offer of proof by Rogers of what his object was in getting in the car and going home are of no importance, since it clearly appeared from the undisputed evidence that he took Rogers home and we have assumed, for the purposes of our decision, that in doing so he was, for that time, not in defendant's service.

Objection was made to plaintiff's instruction informing the jury that if they believed the chauffeur was at the moment of injuring plaintiff in the employ of defendant for the purpose of operating the machine that those facts were sufficient to raise a presumption

that the chauffeur was at that time acting within the scope of his authority. The point of objection is that there was evidence showing whether he was acting within the scope of his authority and that when there is evidence tending to show a certain essential in a case, there is no room for application of a presumption, but the matter must be decided on the evidence unaided by a presumption. Applying this statement to this case, if the only evidence introduced had been that a man driving a machine had run plaintiff down and that the machine was defendant's and the man was in his employ as chauffeur, then the presumption that he was within the scope of his employment at the time and place would arise. But as the evidence laid bare the whole affair, showing every detail of what the chauffeur was directed to do and when and how to do it, there is no place for a presumption and the case should be decided on the facts and inferences drawn from them. [Tetwiller v. Ry. Co., 242 Mo. 178, 194; Mockowick v. Ry. Co., 196 Mo. 550, 571; Higgins v. Ry. Co., 197 Mo. 300, 317.]

As the effect of this instruction was to say to the jury that however deficient the evidence is in which the scope and course of employment has been endeavored to be proven, you may still find for plaintiff on the presumption that such scope included passing the place of the accident at the time it happened.

For error in giving that instruction, the judgment is reversed and the cause remanded. All concur.