## DAVIS v. JEFFORDS-SCHOENMANN PRO-DUCE & BROKERAGE CO. et al. *
(No. 8417.)

(Court of Civil Appeals of Texas. Galveston. Feb. 15, 1924. Rehearing Denied, April 3, 1924.)

1. Marriage ⊕⇒50(5)—Evidence held to show common-law marriage.

Evidence of agreement first made in Louisiana to become husband and wife, novated and ratified on coming to Texas to reside, continued living together under the compact, holding themselves out and introducing each other as husband and wife, *held* to show common-law marriage in Texas.

2. Marriage ⊕⇒40(4)—Prior illicit relations raising presumption of continuance not shown by fact that relations legal in Texas were begun in another state where illegal.

Where evidence was sufficient to show common-law marriage in Texas, it was error to instruct that if cohabitation began in Louisiana where ceremonial marriage was required it is presumed that the illicit nature of the relation between the parties continued, unless shown to have changed.

3. Master and servant ⊕⇒302(6)—Owner liable for negligence of truck driver going to lunch.

Where employer allowed truck driver to retain control of and use truck at all hours of the day for his convenience, in order that he might put in longer hours by saving time in going to and from work at end of day and at meal times, employer was liable for injuries to one struck by driver while driving to lunch.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Action by Gussie Davis against the Jeffords-Schoenmann Produce & Brokerage Company and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Nichols & Sargent and Pritchett Harvey, all of Houston, for appellant.

Sewall Myer and Andrews, Streetman, Logue & Mobley, all of Houston, for appellees.

GRAVES, J. Appellant sued the appellees for damages for their alleged negligence in running over and killing—with one of their auto trucks operated by Oscar Godfrey, their regular driver—Louisiana Davis, whom he charged to be his wife at the time by virtue of a valid common-law marriage in Texas.

Judgment below was rendered in favor of the appellees, after the jury had answered "No" to this special issue submitted to them by the court:

"Was Louisiana Davis the lawful wife of Gussie Davis, the plaintiff in this suit, at the time of her death? Answer 'Yes' or 'No,' as you find the facts to be.

"In answering the foregoing question you are to understand that, under the Louisiana law, the relation between Gussie Davis and Louisiana Davis in that state was illicit and illegal. The burden of proof rests upon the plaintiff to show by a preponderance of the evidence that a legal status of man and wife has been acquired since said parties left the state of Louisiana.

"You are told, however, that in Texas a ceremonial marriage is not necessary to create the legal status of husband and wife, and where two parties, capable of contracting marriage in good faith, agree to become man and wife, and follow up said agreement by cohabitation and assuming the duties and responsibilities of the marriage relation, the law will recognize the status of marriage thus established as legal. But if the cohabitation begins in a state where a ceremonial marriage is required, the law presumes that the illicit nature of the relation between the parties continues unless it is shown to have been changed. Whether or not such change occurred is for you to say in the light of all the facts and circumstances here before you."

[1] In this court appellant contends that the charge was erroneous, and that the verdict thereon was against the undisputed evidence, which conclusively showed that Louisiana Davis was his common-law wife in Texas. Appellees, upon the other hand, insist that the judgment so rendered was the only proper one for two reasons: (1) The charge given was more favorable to appellant than he was entitled to, and the finding upon it was amply supported; and (2) in no event could appellant recover, because it was established by the undisputed evidence that at the time of the accident "Oscar Godfrey had voluntarily turned aside from the prosecution of his master's work and the furtherance of his master's interest to engage in an affair wholly his own, and thereby had suspended the relation of master and servant."

As we view the record, the undisputed testimony disclosed a common-law marriage in Texas between Gussie and Louisiana Davis, wholly apart from and independent of what had been their status back in Louisiana. The charge as given was therefore not applicable to the facts developed, and was accordingly erroneous.

If the ganancial relations of the parties, or the facts about their living and associating together in Texas, standing alone, were such as to constitute them husband and wife under our laws, obviously it could make no difference when the legal character of this association here became the subject of judicial determination in our courts what it had been in another jurisdiction where they formerly lived.

The main testimony about the matter was that of appellant, the plaintiff below, no effort being made to controvert any of it, and so much of it as we think shows a com-

⊕⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction May 28, 1924.

261 S.W.—26

mon-law marriage in Texas is quoted at length as follows:

"My name is Gussie Davis. I live. at 1111 Shearn street, Houston, Harris county, Tex. I am 25 years old. I am the plaintiff in this suit. On or about the 10th day of August, 1921, I was living at 1109 Andrew street, in the city of Houston, Harris county, Tex. Prior to the 10th day of August, 1921, Louisiana Davis and I were living together. We lived together from 1918 until the time she got killed. Prior to the death of Louisiana Davis she accepted me as her husband and I accepted her as my wife. We cohabited together. She cooked my meals. From 1918 until she got killed, Louisiana Davis cooked my meals and kept my laundry clean and did the housework. She went by the name of Louisiana Davis. During the time from 1918 to 1921, we went out together. We were introduced as husband and wife. We began living together in 1918 in St. Martinville, La. I think we left the state of Louisiana about the year 1918. We went to Beaumont. Beaumont is in the state of Texas, in Jefferson county. Just after I got to Beaumont, I written to Louisiana, and she came over to Beaumont. We cohabited and lived together in Beaumont. We stayed in Beaumont about a year and a half; then we came over here to Houston. I guess we had been living in Houston just about a year and a half before Louisiana Davis was killed. She went by the name of Louisiana Davis over here. I had insurance on the life of Louisiana Davis. I recognize the insurance policy of the American National Insurance Company and the premum receipt book which is handed me. I first saw that insurance policy and the premium receipt book at my house. Louisiana Davis had it. These were there with her other things at the time of her death, in the house where we were living."

At this point appellant introduced in evidence an insurance policy issued October 18, 1920, by the American National Insurance Company of Galveston, on the life of Louisiana Davis, payable to himself as her husband, together with a premium receipt book showing payment of weekly premiums thereunder.

Continuing, he further testified:

"The last time I saw her alive was about 8 o'clock that morning, the 10th day of August, 1921. I made funeral arrangements and had her buried. Louisiana Davis was about 25 years old on the 10th day of August, 1921. Just prior to that time and that date she was in a delicate state, in a family way. She was not a sickly woman. She was pregnant. Louisiana Davis took care of my house from 1918 to 1921; she cooked my meals; she cleaned up my house. She contributed something towards the living expenses during our married life—during the time I lived with her. She worked; she saved up her money, during the time she was working out. Prior to this accident she treated me kindly and lovingly. She loved me. She took an interest in my affairs. She helped me get along."

On cross-examination:

"I lived at St. Martinville, La., before I came to Texas. I was born in Crowley, La. I stayed in St. Martinville, La., about a year. I think St. Martinville was the home of this woman I was living with. Her name was Louisiana Martin when I first met her. She was living with her father at the time. I just went out to St. Martinville on a visit. I worked over there. I first began to live with Louisiana in St. Martinville, La. I lived with her at the home of her parents. No, sir; not at her own house. I moved there about three months after I met her, and from there I went to Beaumont and written her, and she came about a week after that. Yes; I knew that St. Martinville was a parish seat, where they had a courthouse. That is where the courthouse was. I knew where to go to get a marriage license. I knew how people that wanted to get married usually did. I did not do that. We just agreed to live as man and wife; we just went to living together as man and wife. Then we came over to Texas. From St. Martinville to Beaumont and from Beaumont to Houston, and it was just the same in Texas as in Louisiana. There was not any change, except to cross over from one state to the other. When Louisiana worked out she usually got paid by the piece. She was pressing. They were making aprons right over there, and she was pressing them out. She made sometimes as high as $15 to $18 a week."

On redirect:

"After we came to Texas we continued to live together. She called me her husband, and I called her my wife. She did not have any other name in Texas besides Louisiana Davis. She went by that name all the time, and I was introduced in company as her husband, and she was introduced as my wife."

On being recalled, he added that he had never been married to any other person up to the time Louisiana Davis was killed, and that she never had been married to any other than himself, at least not to his knowledge, and she told him she never had been.

The woman at whose house the couple lived testified:

"I live at 1109 Andrews street. I know Gussie Davis; have known him about a year I reckon. I knew Louisiana Davis prior to the time she was killed. I had known her about six months I reckon before they came to my house to room. They came to my house. They were told it was a nice place to stay and they came there as man and wife, and they stayed there until the day she was killed. Gussie Davis paid her bills there all up in advance. He introduced her to other persons as his wife. He came to our house and registered; we have them register when they come there. I don't know just how long they lived there. They were living there at the time of her death."

A number of other witnesses testified to the same manner of living as husband and wife, and to mutual general introductions by one or the other of them as such, over the entire period of their residence in Texas.

There is comprehended within the body of this evidence every essential attribute of a valid common-law marriage in Texas,

as laid down by an unbroken line of decisions by our courts from the early case of Yates v. Houston, 3 Tex. 450, to the present day. See, also, Edelstein v. Brown (Tex. Civ. App.) 95 S. W. 1128; Gorman v. Gorman (Tex. Civ. App.) 166 S. W. 123; Cuneo v. De Cueno, 24 Tex. Civ. App. 436, 59 S. W. 284. The principle these opinions recognize is likewise upheld by the Supreme Court of the United States in Travers v. Reinhardt, 205 U. S. 429, 27 Sup. Ct. 563, 51 L. Ed. 869.

There is here first reflected the introductory agreement to become husband and wife, first made in Louisiana, and subsequently both novated and ratified on coming to Texas to reside, for appellant's statement with reference to their life in Texas that "she accepted me as her husband and I accepted her as my wife" can mean nothing else. It presupposes that they had so agreed after crossing the border line into this state, as was in effect held by the Fort Worth Court of Civil Appeals in the Gorman Case, supra, in this declaration:

"In the very nature of the marriage relation, the continued living together of appellee and the deceased as husband and wife after the removal of the impediment which rendered the original marriage invalid was necessarily a constant offer and acceptance of the mutual relation of husband and wife between the parties, and their cohabitation under such circumstances constituted the lawful relation of husband and wife."

Nor is appellant's further statement that "it was just the same in Texas as in Louisiana; there was not any change, except to cross over from one state to the other" to be differently interpreted, we think. That, as we construe it, had reference to the agreement of the two as to marriage and to the fact that they continued to live together, so amounted merely to a repetition that both of these things also occurred in Texas.

Next there is the steady living and cohabiting together under this compact, with the intent and purpose of creating a marital union, for the entire three years duration of Louisiana Davis' life in this state.

Finally, there is added their so holding themselves out and introducing each other to their friends and the public generally for the same full time.

[2] It is not doubted that such a presumption as was incorporated in the quoted charge does in some circumstances arise, but, since the coming in of this proof made the relation between these parties lawful under what has always been the rule with us, the court should not have instructed the jury at all as to any presumption that might arise from prior association under a different system of jurisprudence. Having done that, however, and having received the jury's verdict on the inquiry made, it should have been set aside on the motion for new trial as being against the undisputed evidence.

[3] Neither do we think the other proofs offered by appellees can support the judgment. Under the evidence upon that issue, which likewise was undisputed, we do not think that their driver, Oscar Godfrey, was shown to have so turned aside to engage in an affair wholly his own as to have caused the suspension of the relation of master and servant between them and himself at the time of this casualty. It occurred while he and another negro, each driving a large auto truck, were racing each other down a narrow street in a populous section of the city of Houston at midday. The testimony on this feature came exclusively from Godfrey himself, and practically all that is relevant is here reproduced:

"I had occasion to go on Andrew street, in the 900 block, between Buckner and Myer streets, on August 10, 1921. That was between 12 and 1 o'clock. I was in a truck, driving a truck. The Jeffords-Schoenmann Produce Company owned the truck. * * *

"I have been working for the Jefford-Schoenmann Produce Company about 11 months. Before that I worked for Gordon, Sewall & Co., wholesale grocers. I have been driving trucks about 5 or 6 years. I live here in Houston, and have been living here about 10 or 12 years. After I had made delivery of groceries, if I had wanted to go back to the place of business of the Jeffords-Shoenmann Produce & Brokerage Company, down on Commerce street, I would have had no occasion to go to Andrew street. As a matter of fact, at the time this accident occurred, and while I was traveling on Andrew street, going towards the west. I was not in any sense of the word headed toward or expecting to go to the place of business of the Jeffords-Schoenmann Produce & Brokerage Company, down on Commerce street. The truth of the matter is, I was only going to lunch. I had an hour each day for lunch. This happened during my lunch hour. For the purpose of going to lunch I had to turn into Andrew street, and I did so at Hiner street, and then I proceeded west on Andrew street.

"I go to dinner out there whenever I am in that neighborhood. I go to work in the mornings at different times I was due. I gets down there mostly at 6, but if something rushing we get there earlier. We work until we get through, I delivers and unloads cars all day long; make deliveries in the city, in a truck. We have several drivers. I drive a truck too. Most of the delivering we do in the mornings, and we unloads cars and different things in the afternoon. We are due off of work at 6 o'clock in the evenings, but we works until we get through. We go to lunch on the deliveries in the noon hour, and we always eats where we are at, in the neighborhood of where we are at.

"I had an hour for lunch. Now, when I had made the delivery, say I was out on a delivery, and it came time for me to take my lunch, it was up to me whether I ate there or went home or came on to town. Just so I had my hour off. My time was my own then, yes, sir.

"I don't know, sir, how long it takes me to

eat dinner. It is owing to how and waht I eat, and according to what I do. Sometimes I take an hour for dinner, and sometimes I only take half an hour off for dinner. If I have a whole lots to do, only take a few minutes. If not much to do, I take an hour. I have eaten before 12 noon. I have eaten after 1 o'clock in the afternoon. * * *

"I got this truck to drive about July, I believe, sometimes. That was about a month before the accident. It had not had any lights on it from the time I got it up to the time of this accident, or brackets. I was instructed to put the lights on there so that in coming down early I would have the lights. I am supposed to get down anywhere from 5 to 6 o'clock. To come down at that time I would have to get up some time earlier. I would have to drive the truck down. My home is in the Fourth ward. When I went to get these lights they were in the store on the right-hand side under the stairway, and they had not been on this car any time prior to this accident, during the time I drove it. In unloading cars this truck was used. Sometimes it would take me till after dark. * * *

"I have unloaded lots of freight cars at night. In the evenings we stay there until we finish. We start in the daytime and finish at night. I don't know, sir, when we finished unloading one at night about the time that this accident happened or not. The railroad company will let you unload freight cars at any time, and I have unloaded lots of them at night. I could not give you any date as to when we unloaded a car after dark. I do not keep up with the dates. The freight comes in on different railroads. We have 10 or 12 cars on the track all the time; different ones on all railroad tracks. Yes, sir; my folks said something about putting lights on this car so that we could unload cars at night, so that we could come down early in the morning. We had to have light to go to and from work, or we would get arrested."

It thus appears, that this truck of his employers was at all periods of the 24 hours of each day under the driver's control by virtue of a custom and agreement between them to that effect. Under that arrangement he kept it over night so that he could the better prosecute and further his master's business by getting down earlier in the morning, working after regular hours, and after dark whenever there was occasion for that, and in shortening the intervals his own rest and refreshment called for. It was the master's will therefore that he should at all times run their truck around the public streets of the city in the general furtherance of their business in the very way he was doing when he ran amuck on the occasion with which this cause has to do. The particular use he was making of the car at the time of the accident, going to his lunch in it, was not only one he was expected by them to make of it, but they had turned it over to him during the noon hour for that purpose, and he was to so go to' his lunch in that neighborhood, when he had made or was out on a delivery for them, whenever the noon hour

struck. He could not therefore be said to have been on an errand exclusively his own, but at least was so mingling his master's business with his own incidental interest in going for lunch in a conveyance they had furnished him for the convenience of both in that respect as that, for the brief time involved, the relation of master and servant was not broken or terminated. These facts rather bring the case squarely within the rule applied in Studebaker v. Kitts (Tex. Civ. App.) 152 S. W. 467 (writ of error denied, 154 S. W. xix).

By the uncontroverted testimony this employee was at the time violating no instructions of his master, but was rightfully using their conveyance for an expressly authorized purpose, and indubitably his going in such circumstances for his lunch—in a neighborhood where he was pursuing their business—was but incidental to his service. Under such conditions, the master is liable. Oil Ass'n v. Brading (Tex. Civ. App.) 212 S. W. 707; Lumbermen's Reciprocal Ass'n v. Behnken (Tex. Civ. App.) 226 S. W. 154; Id., 112 Tex. 103, 246 S. W. 72; Whimster v. Holmes, 177 Mo. App. 130, 164 S. W. at page 239, par. 5.

From these conclusions it follows that the judgment should be reversed, and that, upon another trial, the proof should be confined to the amount of damage, if any, the plaintiff in the cause sustained. That order has accordingly been entered.

Reversed and remanded.

## On Motion for Rehearing.

The briefs filed by both parties, and the arguments in connection therewith on original hearing, presented only two questions: First, whether or not the evidence under proper application of the law thereto established a common-law marriage in Texas between Gussie and Louisiana Davis; second, whether or not it was shown that Oscar Godfrey, the driver of appellees' car at the time of the casualty, had so turned aside to engage in an affair wholly his own as to have thereby suspended the relation of master and servant between them and himself.

In discussing this latter question the appellees' brief, after conceding that it had been shown that Godfrey was at that time the regular driver of one of appellee's auto trucks, proceeded as if no dispute existed over whether the truck he drove caused the accident, and this court assumed that none did in passing on the matter.

Accordingly, in determining these two questions, we did so as if they were the only ones at issue in the cause, and, after holding the trial court's charge erroneous and the facts adduced as to the existence of a common-law marriage in Texas sufficient to establish one, further concluded that the evidence did not demonstrate that

Oscar Godfrey had at the time of this accident so acted on his own account as to sever the relation of master and servant between himself and appellees, ending the opinion as follows:

"From these conclusions it follows that the judgment should be reversed, and that, upon another trial, the proof should be confined to the amount of damage, if any, the plaintiff in the cause sustained. That order has accordingly been entered."

The earnest and able motion of the appellees has called to our attention the fact that there was a controversy as to whether Godfrey's truck ran over the woman, as well as other issues than the two thus before disposed of, and hence our assumption that Godfrey's truck caused the death, and the consequent declaration that the proof should be confined upon another trial to the amount of damage plaintiff sustained, was inadvertent. We should have said that if the evidence upon these two issues upon another trial otherwise proved to be the same and showed that Godfrey's truck killed the deceased, the trial court should not submit either of them to the jury. It was not intended to cut off a trial as to any other matters involved. That opinion is now so corrected, leaving all other issues unaffected.

We have carefully considered the motion for rehearing as it affects these two questions formerly discussed, but are unconvinced of any error in our disposition of them. It will therefore be adhered to.

With this modification of the original opinion, the motion for rehearing is overruled.

Overruled.