**KELLY et al. v. CONSOLIDATED UNDER-WRITERS.  (No. 1619.)**

Court of Civil Appeals of Texas. Beaumont. Dec. 3, 1927.

Rehearing Denied Dec. 21, 1927.

1. Marriage ⬳3—Illegal relations of man and woman held not converted into lawful marriage by temporary sojourn in state recognizing common-law marriage.

Illegal relations of man and woman living as husband and wife in state not recognizing common-law marriage *held* not converted into lawful marriage by temporary sojourn in state recognizing common-law marriages, where such visits were without intention of acquiring residence in any of such states.

2. Marriage ⬳22—Married woman living with man other than husband as his wife became his common-law wife on death of lawful husband, and eligible for compensation for common-law husband's death (Workmen's Compensation Act [Vernon's Ann. Civ. St. 1925, arts. 8306–8309]).

Where woman having living husband lived with another man as his wife in state recognizing common-law marriage, she became common-law wife of such man and eligible to receive compensation under Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts. 8306–8309), for his subsequent death, upon death of her lawful husband, even though she did not know of such lawful husband's death, since consent is presumed to have been given to common-law marriage at first moment when parties were able to enter into contract.

On Rehearing.

3. Names ⬳18—In compensation proceeding evidence held to show as matter of law that deceased having same name as claimant's husband was such husband (Workmen's Compensation Act [Vernon's Ann. Civ. St. 1925, arts. 8306–8309]).

In proceeding under Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts. 8306–8309), by common-law wife for death of husband, in which question whether previous husband was dead became issue, evidence *held* to show as matter of law that deceased who had same name as claimant's former husband was her husband.

4. Names ⬳14—Controverted identity of person cannot be established by identity of name alone.

General rule is that identity of name is evidence of identity of person, and in absence of controverting evidence sufficient to raise presumption to that effect, but if identity is controverted similarity of name alone is not sufficient to establish such identity.

5. Master and servant ⬳417(9)—Judgment in workmen's compensation proceeding, if based on mistake of fact, may be corrected (Workmen's Compensation Act [Vernon's Ann. Civ. St. 1925, arts. 8306–8309]).

In proceeding under Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts.

8306–8309), trial court has authority to correct judgment if it is based on mistake of fact.

Appeal from District Court, Orange County; V. H. Stark, Judge.

Proceeding under the Workmen's Compensation Act by Louisa Kelly for the death of her husband, Joseph Kelly, opposed by J. T. Ferguson, employer, and Consolidated Underwriters, insurer. On an appeal to the district court the award of the Industrial Accident Board was set aside, and claimant appeals. Remanded, with instructions.

O'Fiel & Reagan, of Beaumont, and D. C. Bennett, of Orange, for appellant.
C. A. Lord, of Beaumont, for appellee.

WALKER, J. This is a compensation case, wherein J. T. Ferguson was the subscriber, appellee the insurer, and Joe Kelly the employee. On the 19th of January, 1926, Joe Kelly, while in the due course of his employment with J. T. Ferguson, received a compensable injury, from which he died. The Industrial Accident Board awarded appellant, as the surviving wife of deceased, compensation under our Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, arts. 8306–8309). From that award appellee prosecuted its appeal to the district court of Orange county, where, upon a trial de novo, the trial court instructed a verdict in its favor, setting aside the award of the Industrial Accident Board, and denying appellant compensation, on the theory that the undisputed evidence showed that she was not the wife of Joe Kelly at the time of his death.

Under the pleadings and evidence of appellee, the state of Louisiana does not recognize as valid what is known in Texas as common-law marriages; in that state only ceremonial marriages, solemnized in the manner prescribed by statutes regulating marriage, are valid; the living together and cohabitation as husband and wife of a man and woman not married according to the ceremonies and regulations prescribed by statute are illegal and meretricious in that state, and a contract to live together as husband and wife, without complying with the provisions of the statutes regulating marriages, is void.

In 1902, Joe Kelly and Louisa Lane, the appellant here, negro citizens of Louisiana, living at Amelia, La., began living together and cohabiting as husband and wife, under an agreement that they would be husband and wife, on conditions that in Texas would have constituted a common-law marriage. Without ever contracting a ceremonial marriage, but living together under this agreement, they made their home at Amelia, La., from 1902 to 1920. During these years Joe Kelly worked about a year in each of the states of

Florida, Alabama, Mississippi, and Texas. In all of these states it appears that common-law marriages are recognized on the same legal principles as in this state. While Joe was working in Florida, appellant visited him about three months, about two months in Alabama, about two months in Mississippi, and about one month in Texas. While visiting Joe, he received her as his wife, introduced her to his new friends as his wife, and they lived and cohabited as husband and wife, but their absence from Louisiana was only temporary, and during all these years they maintained their home at Amelia, La., recognizing that their absence from their home was only of a temporary nature, for the purpose of securing employment, and Louisa's visits to Joe were purely in the nature of visits, and without any intention whatever of acquiring a residence in any of those states.

[1] Under the statement as made, the law of Louisiana declared the relations between Joe and appellant illegal and meretricious, and their temporary sojourn in the states recognizing common-law marriages did not convert their illegal relations into a lawful marriage.

[2] In 1920, Joe Kelly had some trouble with appellant's sister, while he was living at Amelia, La. Thereupon he deserted appellant and left Louisiana, and appellant did not hear from him until 1925. At the time Joe Kelly deserted appellant, they were not husband and wife, and, as neither of them had previously married, they were single persons in the eyes of the law. A few months after Joe Kelly deserted appellant, she heard that he was dead, and in March, 1920, contracted a ceremonial marriage with one George Brown, under authority of a marriage license duly issued and duly executed, thereby becoming his lawful wife. Recognizing the validity of this marriage, she lived with George Brown at her home in Amelia, La., until 1925, when, learning that Joe Kelly was living in Beaumont, Tex., she deserted her husband and joined Joe Kelly at Beaumont in October, 1925, and lived with him continuously from that date as his wife until his death on the 19th of January, 1926. They resumed their relations with the intention of living together as husband and wife until their death. Joe Kelly introduced her to his Beaumont friends as his wife, and she acknowledged him openly as her husband. They lived and cohabited as husband and wife, and received their friends in their home as such, and their friends recognized them as husband and wife. The relations between Joe and appellant were such that, except for the fact that Louisa had a living husband, the law would have declared their status to be that of a common-law marriage. There is no evidence against that conclusion. But

for the fact that George Brown, Louisa's husband, was living when she rejoined Joe Kelly in Beaumont, the conditions under which they resumed their relations would have made them husband and wife. George Brown died about Thanksgiving, 1925; but neither appellant nor Joe Kelly knew of that fact, and appellant had no knowledge of it until after Joe's death. The death of George Brown made no change in their relations. They made no new contract in relation thereto, but from October, 1925, when they reunited their lives in the city of Beaumont, Tex., there was no change in their relations until Joe's death in January, 1926.

On the facts stated, did the court err in instructing a verdict against appellant on the theory that she was not the common-law wife of Joe Kelly at the time of his death? We think this question must be answered in the affirmative. It is our conclusion that the undisputed facts, as a matter of law, constituted appellant the wife of Joe Kelly on January 19, 1926, the day he received the fatal injury. These negroes had lived together for almost 20 years. During all that time they had been to each other husband and wife, and were recognized as such by their friends. Joe performed all the duties of a husband, and Louisa those of a wife. Until Thanksgiving, 1925, the relations were illegal, but that was because of the bar interposed by law, and not because of a want of intent on their part. They wanted to be husband and wife. It was their express intent to be husband and wife. As they had no knowledge that the bar to their Texas common-law marriage had been removed, they did not and could not enter into a new contract on that basis. Yet on these facts we think because of the sanctity of the marriage relation, a sound public policy impels the law to infer consent "to have been given at the first moment when the parties were able to enter into the contract." Campbell v. Campbell, L. R. 1 H. L. 182. As they desired marriage, and intended their relations to be that of husband and wife, this continuing intent must be recognized during all the time they cohabited as such, and therefore the agreement upon which they renewed their relations made them husband and wife from the moment the bar to their lawful marriage was removed. As said in Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. S. 512, it was immaterial whether they knew "of that removal * * * the fact being that it was removed, and their consent to the matrimonial relation may be inferred from their acts and conduct." Our conclusion on this proposition is based upon the dissenting opinion of Mr. Associate Justice Looney in United States Fidelity & Guaranty Co. v. Dowdle (Tex. Civ. App.) 269 S. W. 119, wherein he cited and reviewed the author-

ities cited by us, together with many others. In entering his dissent, Judge Looney said: "The courts of the country are by no means harmonious on this subject." Though the majority opinion in that case is supported by the highest authority, we believe Judge Looney's dissent is more in harmony with a sound public policy. As the Dowdle Case is the only authority from this state that has been called to our attention, we do not feel bound by the majority opinion, though we recognize the careful research and sound learning of the able judge who wrote it.

Davis v. Jeffords, etc. (Tex. Civ. App.) 261 S. W. 401, while not involving the exact proposition before us, is interestingly in point in its argument and in part on its facts. We have had the privilege of examining appellee's brief in that case, and note that many of the authorities relied upon by the majority of the court in the Dowdle Case were cited and ably reviewed by appellee in its brief in the Davis Case, yet the Galveston court refused to follow the argument of appellee, and the Supreme Court refused to take jurisdiction against their judgment.

It seems to us that Travers v. Reinhardt, 205 U. S. 423, 27 S. Ct. 563, 51 L. Ed. 865, is in point in its argument, and somewhat on its facts. In that case the able judge of the Supreme Court of the United States reviewed and gave controlling effect to the relations between the man and woman from 1865 to 1883, when they were living in an illicit and meretricious relation.

From what we have said, it follows that the judgment of the trial court in favor of appellee must be reversed and judgment here rendered in favor of appellant for compensation in the amount as per agreement filed.

Reversed and rendered.

### On Rehearing.

[3] Appellee insists that we are in error in holding that George Brown, the husband of Louisa Kelly, died about Thanksgiving, 1925. The facts on this issue are as follows:

Eola Chase, a niece of appellant, testified:

"I have been living at Beaumont, Tex., since about September, 1925. At that time Aunt Lou (appellant) was at home. She just had come from Mississippi the week I came up here, and spent a week at home, but I left there. * * * I don't know how long she was in Mississippi. I couldn't say whether it was as much as a year. * * * When she left to go there, I was at home in Amelia. * * * I never knew George Brown. I knowed of one George Brown, the George Brown she married in Mississippi, but I have not even seen George Brown. I just heard her talk about him. She married him in Mississippi. I don't know what year she was married to him. She told me that she married George Brown in Mississippi. * * * That George Brown was not raised right there in Amelia, La. I didn't know him personally. I

couldn't tell you where he is now; I heard that he is dead. * * * She wrote me a letter dated at Moss Point, and said she had gotten married to a man by the name of George Brown. * * * The last time I heard about him they said George was dead. * * * I also heard her say, 'We were married at Moss Point, Jackson county, Mississippi in 1922, I think.' And also that 'George Brown is now living at Amelia, La.' * * * I heard that George Brown was dead since I have been over in Texas, because I never have gone back home. Yes; I did hear that George was dead. That was after Joe was killed. I heard about that afterwards; yes, sir. I don't know how long he had been dead at the time I heard it. I don't know when he died. I just heard that George Brown was dead."

### Jesse Brown testified:

"My name is Jesse Brown; I live at Morgan City, La., and am 35 years old. I know Louisa Kelly. I have known her a pretty good while. I have only known her by the name of Louisa Kelly. I knew Joe Kelly. I worked under him. He got killed. That is the same Joe Kelly that was working for Mr. Ferguson. I have worked for Mr. Ferguson. I knew a man by the name of George Brown. I knew him at Morgan City. I knowed him ever since I can remember, myself. George is dead. He died about Thanksgiving, 1925. He was a relation of mine. He and my father were brothers. He was my uncle; yes, sir. I was there when they buried him. He died of some kind of hemorrhage. He was sick for two or three days before he died. I was in New Orleans when he died; but I come up. I don't know anything about George Brown and Louisa living together. I don't know anything about my uncle, George Brown, living with Louisa Kelly; no, sir. I don't know where he died; but it was out on a farm in Louisiana. I don't know how far it is from Amelia, or from Morgan City. As to what the closest town was, well, you get off the train at Raceland Junction, and then it is about ten miles out in the country. I was there shortly after he died; yes, sir. He died about Thanksgiving, 1925. Louisa Kelly is colored. I don't know what her maiden name was. George Brown was colored, and so was Joe Kelly. I couldn't say whether the George Brown I spoke of was married to Louisa, because I wasn't at no wedding or anything like that."

### Louisa Kelly, appellant, testified:

"I married a man by the name of George Brown at Moss Point, Miss. * * * It was after I heard that Joe was dead that I contracted to marry George Brown. I afterwards learned that Joe was alive, and I separated from Brown after that time. * * * As to how long it was before I rejoined Joe that I saw Brown—well; I saw Brown when I left home, and I left there in 1925, and he was there when I left on the 20th day of October. I saw him two or three days before I left there. He was living when I left. Boeuf, La., is my home, which is the same as Amelia. The railway station is named Boeuf, and the post office is Amelia. After I left home in October I came to Beaumont, to Joe. * * * I have not seen Brown any more since 1925. I have not been back to Amelia since then. * * * When Joe went off in 1919 he left me at Amelia. I went to Mississippi a year after

that. Yes; I went there in 1920, to Jackson county. Miss. It was there that I married George Brown. I had not known George before that time. I met him over in Mississippi. I got my license on the 12th of March, 1920. * * * I continued to live there with George Brown from March, 13, 1920, up to 1925; then I came back to Amelia. * * * I have not seen Brown any more since 1925. The last time I saw him was in 1925 at Amelia. * * * As to whether George had been raised at Amelia, no; I don't know where he was raised."

Morgan City was six or seven miles from Amelia.

We have taken the following brief of authorities from article, "Identity," Ency. of Ev. vol. 6, p. 910:

[4] The general rule is that identity of name is evidence of identity of person, and in the absence of controverting evidence is sufficient to raise a presumption to that effect. But this is a rule of convenience and is limited both in its application and its effect by the purposes and attending facts of the judicial hearing in which the issue is involved. Thus in Bryan v. Kales, 3 Ariz. 423, 31 P. 517, it was said:

"An examination of authorities will show that this rule of evidence is not one of universal application; that it grew out of the general presumption in favor of the validity of contracts, the regularity of land titles, and the integrity of records; that, wherever its effect would be to negative these general presumptions, the reason of the rule ceasing to exist, the rule itself becomes inoperative."

In Ellsworth v. Moore, 5 Iowa, 486, the court refused to apply the rule in a case where the judge was "Honorable J. D. Thompson," and one of the attorneys of record was "J. D. Thompson." In Prescott v. Tufts, 7 Mass. 209, where the name of the plaintiff was the same as the name of the trial judge, identity of person was not presumed. In Richardson v. Dugger, 85 Ill. 495, where the name of the county judge who approved a conservator's bond and that of the surety were the same, the presumption was not indulged. Again, the presumption was denied where one of the parties to a suit was the same name as the sheriff who served the process. Howard v. Locke (Ky.) 22 S. W. 352; Waller v. Edmonds, 47 Tex. 468. That two of the petit jurors have the same name as two of the grand jurors does not raise the presumption was held in Wickersham v. People, 1 Scam. (2 Ill.) 128. The rule was not invoked where the plaintiff and an officer taking his affidavit as an incident to the trial had the same name. Dorente v. Sullivan, 7 Cal. 279. Where the plaintiff and the defendant have the same name, the presumption is not indulged. Wilson v. Benedict, 90 Mo. 208, 2 S. W. 283; Allin v. Shadburne, 1 Dana (Ky.) 68, 25 Am. Dec. 121. But there are authorities to the contrary. Sweetland v. Porter, 43 W. Va. 189, 27 S. E. 352; Tavenner v.

Barrett, 21 W. Va. 656. It is corroboration of identity of name to show that only one person of that name resided in the same vicinity. Savery v. Moore, 71 Ala. 236. The time when a person became a resident of the state or of the community may be relevant. Keck v. Woodward, 53 Tex. Civ. App. 267, 116 S. W. 75. And to show that another person of the same name resided in the same vicinity weakens the presumption, but does not destroy it. Jackson v. Cody, 9 Cow. (N. Y.) 140; Flournoy v. Warden, 17 Mo. 435; Cuddy v. Brown, 78 Ill. 415. That the name is a very common name weakens the presumption. Wilson v. Holt, 83 Ala. 528, 3 So. 321, 3 Am. St. Rep. 768. However, there is respectable authority for the proposition that the presence of another party of the same name in the same vicinity destroys the presumption. Garrett v. State, 76 Ala. 18; Jones v. Parker, 20 N. H. 31. The rule that identity of person can be presumed from identity of name has its most frequent application to chains of conveyances of real estate. The general principles of the rule are illustrated by the authorities cited. In this state the evidentiary value of identity of name depends upon whether the question of identity is seriously controverted. It has been held:

"Similarity of name is held to be sufficient to establish identity of the person, when there is no evidence to the contrary, and no suspicion cast upon the transaction by the evidence; but in case the identity is controverted, then similarity of name alone is not sufficient to establish such identity. Robertson v. Du Bose, 76 Tex. 1 [13 S. W. 300]. It depends upon the issue made by the evidence as to whether or not the similarity of name is sufficient. McNeil v. O'Connor, 79 Tex. 229 [14 S. W. 1058]; Fleming v. Gibboney [Giboney] 81 Tex. 427 [17 S. W. 13]. If the issue is that the deed was not executed by the person in question, then the identity of the person is put in direct issue, and if evidence be introduced tending to prove that the person who executed the deed was not the person in question, similarity of name alone will not be sufficient to establish the fact. If the issue be that a given person did not sign the deed, then similarity of name is sufficient to connect the links in the chain of title." Jester v. Steiner, 86 Tex. 415, 25 S. W. 411.

Our conclusion that George Brown, the ceremonial husband of Louisa Kelly, died about Thanksgiving, 1925, can be supported only by invoking the rule that identity of person can be presumed from identity of name. Under the Texas rule, on the facts of this case, the conclusion that the George Brown, who died at Morgan City at Thanksgiving, 1925, was the husband of Louisa Kelly, would not follow on identity of name alone. But the evidentiary value of the presumption is strengthened by the following circumstances: (a) The witness Eola Chase testified, without objection from appellee,

that she had heard that George Brown, appellant's husband, was dead; (b) George Brown and appellant lived in Mississippi from 1920 until September, 1925, when they moved to Amelia; Amelia, Morgan City, and Boeuf were in the same immediate neighborhood; the George Brown who died Thanksgiving, 1925, was a resident of Morgan City, that is, he lived near Morgan City, and it was near this place where appellant last saw her husband; (c) it was not shown that any other George Brown lived in that community. The fact that Jesse Brown did not know of the marriage of his uncle to Louisa Kelly has very little probative force. Louisa Kelly had been known to Jesse Brown for a long time, but he had not seen her since 1920. His uncle, George Brown, died on a farm somewhere near Amelia or Morgan City. The witness did not know whether his uncle was married to Louisa, to quote his language, "because I wasn't at no wedding or anything like that." Indulging the presumption and giving it the benefit of the corroborating circumstances, we believe the conclusion follows as one of law that the George Brown who died in 1925 was the husband of appellant.

[5] However, because of the practice controlling judgments in compensation cases, appellee can suffer no injury from this conclusion, since the trial court has the authority to correct its judgment if it is based on a mistake of fact. Reviewing the record, it is our conclusion that appellee's motion be and the same is hereby granted, and that the cause be remanded to the trial court, with instructions to enter judgment in favor of appellant for the amount of compensation as per agreement filed in that court, reserving to itself the power to reopen the case and set aside the judgment upon a showing that George Brown, the husband, is, in fact, living. But appellee shall continue to pay compensation under the judgment until that fact shall have been judicially ascertained.