**GADDIS et al. v. JUNKER et al.**

No. 1943.

Court of Civil Appeals of Texas. Beaumont.
April 25, 1930.

Rehearing Denied May 28, 1930.

E. E. Easterling and W. D. Gordon, both of Beaumont, for appellants.

C. A. Lord, W. G. Reeves, Orgain, Carroll & Bell, and F. J. & C. T. Duff, all of Beaumont, and Jno. E. Green, Jr., of Houston, for appellees.

WALKER, J.

This was an action in trespass to try title by appellants against appellees, suing for the title and possession of an undivided interest of 615 acres in 741 acres out of a tract of 1,660½ acres awarded the four children of William H. Smith in a partition of the William H. Smith league of land in Jefferson county, Tex., in probate court on July 26, 1847. There were two groups of plaintiffs, one suing as the heirs of Mary Green and the other suing as claimants under, or heirs of, P. O. Brousan. The history of these claims is as follows: The four children of William H. Smith, to whom the land was awarded in the partition suit, were John B., William H., Jr., Mrs. Partain, and Mary, who subsequently married William H. Green in Jefferson county, Tex., on the 23d of December, 1849. John B. and Mrs. Partain, prior to the Civil War, sold their interests under this partition by valid conveyances. Mary, joined by her husband, by deed dated the 19th day of April, 1850, attempted to convey her interest to P. O. Brousan, but as to her and her heirs this deed was void because defectively acknowledged by her; William H. died during the Civil War intestate, owning his interest in this land, and without issue. After the death of her husband, William H. Smith, the mother of these four children subsequently married and died about 1853, leaving surviving her by this second marriage two children, identified in this record as Mrs. Raymond and Mrs. Duffy. As John B. and Mrs. Partain had sold their interest under the partition prior to the death of their brother William H., their subsequent interest in the land was limited to the one-fourth interest each inherited under this deceased brother. Mary Green also inherited a one-fourth interest in his estate, as did the two half-sisters, Mrs. Raymond and Mrs. Duffy. By actual survey this tract of land contained 1,808 acres. By suit, judgment entered in 1899, John B., Mrs. Partain, and their two half-sisters, Mrs. Raymond and Mrs. Duffy, and those holding under them, asked for partition of the 1,808 acres against those holding under the conveyances made by John B. and Mrs. Partain prior to the death of their brother William H. The interests thus owned

by the claimants under the Smith and Partain deeds were awarded to them by the 1899 judgment in two separate tracts each containing 410 acres off the south end of the 1,808 acres, that is, Mr. Arceneaux, claiming under one of these conveyances, was awarded 410 acres by specific metes and bounds off the extreme south end of the tract, and Mr. Broussard was awarded a second 410 acres by specific metes and bounds immediately north of the Arceneaux 410 acres. By this judgment appellee Guy Junker was awarded a third tract of 247 acres off the south end of the 1,808 acres, lying immediately north of the Broussard 410 acres. The balance of the 1,808 acres, being 741 acres, was awarded to the plaintiffs in the judgment of 1899. Neither Mary Green nor her husband nor her children, nor any one holding by conveyances under her or her husband or children, were parties to the judgment of 1899, nor were they named in any way in that suit. From the judgment entered therein it appears that the suit was brought on the theory that the plaintiffs named therein were all the heirs of William H. Smith, deceased. Subsequent to the judgment of 1899 the plaintiffs therein, and those holding under them, conveyed 51 acres, by specific metes and bounds, out of the 741 acres to appellee James F. Weed. This tract of land was in the form of a square, bounded on the east by the east boundary line of the league and on the south by the east end of the north boundary line of the Junker 247-acre tract; also, subsequent to the entry of the 1899 judgment appellee Guy W. Junker acquired the interest of all the plaintiffs in that judgment to the balance of the 741 acres, that is, all the 741 acres, except the 51 acres sold to Weed. As presented on this appeal, the group of plaintiffs suing as the heirs of Mary and William H. Green claim their undivided interest of 615 acres in the 741 acres exclusive of the Weed 51 acres.

The following is the history of the claim of the group of appellants suing as heirs of P. O. Brousan, or holding under such heirs. As just stated, Mary and her husband, in 1850, attempted to convey her undivided interest in the 1,808 acres to P. O. Brousan. On the 21st day of July, 1925, this group of plaintiffs filed suit in the district court of Hardin county against the unknown heirs of Mary and William H. Green to recover an undivided one-fourth interest in the 1,808 acres. After citation had duly issued, and on subsequent proceedings in all things regular, judgment was duly entered in that cause on the 12th day of September, 1925, in favor of the plaintiffs and against the unknown heirs, as named, for the one-fourth undivided interest sued for. After the entry of that judgment, but within the time allowed by law, the appellants herein, who sue as the heirs of Mary and W. H. Green, moved to set aside the Har-

din county judgment of September, 1925. That motion was in all things overruled by the trial court, and exceptions thereto properly reserved preparatory to an appeal to this court. Pending the perfection of the appeal, the parties thereto settled their conflicting interests upon a satisfactory basis, and all parties in that proceeding joined as plaintiffs in filing and prosecuting this suit, making defendants herein appellees James F. Weed and Guy W. Junker and all parties holding under Junker. Since 1923 the land has become of great value because of the discovery of oil near its boundaries.

It is sufficient to say of the answers of the defendants that they plead not guilty and the several statutes of limitation.

■■ On the trial it was ruled, as a matter of law, that the group of appellants claiming under the Hardin county judgment of September, 1925, had no interest in the land by virtue of that judgment. By their testimony appellants undertook to show that the group of plaintiffs suing as the heirs of Mary Green were in fact her heirs. That issue was controverted by appellees. Appellees also undertook to support their pleas of limitation by appropriate testimony. Upon a trial to a jury it was found that Weed had perfected limitation of five years to his 51 acres. It was also found that all the appellees had perfected their claim of ten years' limitation. The issue of heirship was sent to the jury by the following question, which was answered in the negative:

"Special Issue No. 1.

"Do you find from a preponderance of the evidence in this case that the plaintiffs suing as the heirs of Mary Green, deceased, are the true heirs of the Mary Green who was the daughter of William H. Smith, to whose heirs the land in controversy was originally granted?"

Against this question appellants have the following assignments: First. They insist that this question, as framed, submitted an issue of law to the jury. This contention is denied. As we construe the question it carried directly to the jury, in an affirmative way, the claim of the group of appellants suing as such that they were the heirs of Mary Green. The identity of the heirs of a given party, raised as was the issue in this case, is always a question of fact. The term "heirs" has a technical meaning not readily understood by the average juror; however, since that trouble can be easily obviated by a proper definition, it presents no difficulty in submitting the issue as was done here. Had the word been properly defined, the jury could have had no trouble in measuring the facts by the technical definition of the term. As appellants requested no definition and reserved no exceptions to the trial court's failure to define the term, it must be presumed that the jury correctly understood the issue. Second. Appellants assign error against the refusal to submit the following question: "Was William Green, who married Mary Smith, the same man who married Zelma Granger in 1860 and Elizabeth Wakefield in 1863?" This assignment is overruled. The issue requested was no more an affirmative submission of appellant's theory of the case than the issue submitted.

■ By their third proposition against question No. 1 appellants insist that the jury's answer to this question is against all the evidence in the record. They also insist that the court erred in refusing to instruct the jury peremptorily that the appellants claiming heirship under Mary Green were in fact her heirs. However, appellants have no proposition that the answer to this question was so against the great weight and preponderance of the testimony as to be clearly wrong. Appellants have briefed the question simply as one of law, presenting the single issue that there was no evidence against their claim of heirship. On this issue the following facts appear without controversy: Mary Smith married William H. Green in Jefferson county, Tex., on the 23d day of December, 1849, who at the date of his marriage could not sign his name. After the death of Mary's father her mother moved with her family, including Mary and her husband, to Matagorda county. The evidence is indefinite as to how long Mary and her husband lived in Matagorda county, but it appears with reasonable certainty that they left there in 1853 and moved to Louisiana, where two daughters were born to them, Cornelia and Selama. Mary died in Louisiana about 1856 or 1857, leaving surviving her these two children and her husband. On the 1st day of January, 1860, in Orange county, Tex., William H. Green married a second wife, Miss Zelma Granger. One baby, a girl named Marie, was born to this marriage. The second wife, Zelma, died at Neblett's Bluff, La., in 1861 or 1862, about 18 miles from Orange, leaving surviving her this baby and her husband. Cornelia and Selama were raised by their mother's kindred at Royville, La. On the 14th day of January, 1874, Cornelia was lawfully married to James Hannon. At that time she was fourteen or fifteen or sixteen years old. She died about a year after her marriage, without issue, leaving her husband surviving her. The evidence was without controversy that James Hannon was an ignorant old man, unable to read or write; that he could not write his name; that he was about seventy-two years old at the date of his marriage; that he was poor; that Cornelia was poor when he married her, and that he worked in a livery stable. It was shown without controversy that Selama married Louis Zampini when she was a very young girl; that she was dissolute in her life and Zampini divorced her in the district court

of Galveston county, Tex., on the 27th day of June, 1879. On the 4th day of April, 1880, Selama married Philip G. Sassella.

One group of plaintiffs sued as the heirs of James Hannon. The following summary of the testimony of appellant Mrs. Kate Hannon reflects all the testimony offered by them on the issue of identification: Kate Hannon's husband was Joseph Hannon. His father, Patrick Hannon, died in 1860 or 1861. Her husband died in October, 1895. Her husband's father, Patrick, had three brothers, James, Michael, and Peter. James was the second son. He left New Orleans in 1859 or 1860 and was never heard from afterwards, except Peter heard from him through one of his friends that he was married; that he married a lady named Green, "Selina I think was her name—Cornelia." Uncle Peter "heard that he was married and doing well." "I never heard they had any children." The witness thought that James Hannon survived his wife about two years. All the Hannon boys were born in Ireland and went to school in Ireland. None of them went to school in this country. On the testimony of this witness James Hannon was between thirty-four and thirty-five years old when he left New Orleans in 1859 or 1860, making him about forty-eight years old in 1874. These facts raised an issue against appellants' claim of heirship under James Hannon. The Hannon under whom appellants claim was only forty-eight or forty-nine years old at the time Cornelia married James Hannon; her husband was admittedly at least seventy-two years old. Appellants' James Hannon was a man of some education; Cornelia's husband was an ignorant man who could neither read nor write. After his marriage appellants' James Hannon did well; the contrary was shown of Cornelia's husband; both she and her husband were very poor and continued poor after their marriage. But, independent of all other circumstances in the case, because of the difference in their ages, appellants' James Hannon could not have been the old man who married Cornelia. Where no issue of fact is made against the claim of identity, the law is that similarity of name is sufficient to establish identity of person; but, where there is evidence to the contrary, similarity of name alone is not sufficient to establish identity as a matter of law. Similarity of name may be of great probative force, or may have but little weight, according to the other circumstances in the case. That is the case here. We had occasion to review this proposition with some degree of care in Kelly v. Consolidated Underwriters (Tex. Civ. App.) 300 S. W. 981, where it is fully illustrated by the cases cited. The following additional authorities support our construction of this testimony: Byers v. Wallace, 87 Tex. 503, 28 S. W. 1056, 29 S. W. 760; McNeil v. O'Connor, 79 Tex. 227, 14 S. W. 1058; Jester v. Steiner, 86 Tex. 419, 25 S. W. 411; Stafford v. Kreinhop (Tex. Civ. App.) 63 S. W. 166; Blunt v. Houston Oil Co. (Tex. Civ. App.) 146 S. W. 251.

Another group of appellants sued as the heirs of W. H. Green and his daughter Cornelia. This group of appellants claim that, after the death of Zelma, W. H. Green married Eliza J. Wakefield on a license duly issued by the county clerk of Victoria county, Tex., on the 16th day of December, 1862. Three children of the marriage of W. H. Green to Eliza Wakefield are appellants herein and testified on the trial of this case. On family history, on what their father told them and on what their mother told them, these three children testified that their father's first wife was Mary Smith; that two children were born to that marriage, Cornelia and Selama. That after Mary died their father married Zelma Granger, and one child, Mary, was born to that marriage, but this statement was modified by one of them on cross-examination. They testified further that when Mary was a very small child their father went to Louisiana and took Mary from her relatives there and brought her to his home, about fifteen miles from Seguin in Guadalupe county, where she lived until she married about 1879, and that during all the years since they have known and recognized Mary as their half-sister. They also testified that Selama visited in their home; came back with their father when he went after Mary; stayed a little while and left. They identified Selama's first husband as Zampini, but did not know much about Selama. Without a full review of this phase of the testimony of these children, it is sufficient to say that, on the facts of their testimony, they made out a complete case of identity of their father with the W. H. Green who first married Mary Smith. The following excerpts from the testimony of these children and of their half-sister Mary, who married Guyer, will make clear their issue of identity. The father of these children, W. H. Green, died in 1888 near Kingsbury in Guadalupe county, and was buried at Brushy Creek in that county. The father was about six feet one inch tall, had gray eyes and his hair was "between light and a dark color." The son Hillary testified that prior to the time he set up a claim to this land he thought his half-sisters Mary and Selama were full sisters. He said: "I don't know whether it is true or not * * * that my father was married three times and that his first wife was Mary Green; that is something I know nothing about and never heard anything about until John Brooks told me about it. * * * I say my father was about six feet one inch tall. He wasn't called real slender, brown hair. * * * I don't know where he was born. I judge he was of French descent. * * * I say I saw a mar-

riage certificate in 1925. Mr. Brooks showed it to me. * * * I just thought it was my father's certificate. * * * And that was the first time I ever heard it suggested from any source that my father had married a Mary Smith."

Mrs. Mary Guyer testified that she was a daughter of W. H. Green; that her mother was a Miss Granger; that the first time she remembered her father was when he came for her while she was with one of her relatives in Louisiana, when she was about six years old; that all her prior life she had lived with this relative; she remembered that Selama married Zampini; she fully described her trip from Louisiana to her father's home in Guadalupe county; at that time her father was married to Eliza Wakefield; on this first visit to her father's house her half-sister Selama went with her, but Selama did not stay at her father's home more than a month or two when she went back to Galveston; this witness had brown eyes and brown hair; she testified that her hair was much darker when she was a young woman; she thought Selama's second husband was Johnson; she could not recall the name of her aunt with whom she lived in Louisiana; Selama died after her father died. We quote as follows from appellees' summary of the testimony of this witness: "That witness married in 1879. That her sister wasn't living there with her, but lived down at Black Ankle some six or seven miles away. That she did not know when she came there, but was there at Black Ankle a long time. That witness was married when her sister came there with her husband Johnson. That her sister came there six or seven years after that, which was about 1885, and she stayed there with her father at his home with her husband for some time. That was before her father died in 1888. That her father was a very tall, black-haired, dark man. That her father went to the war, had heard him talk about it."

Henry Green testified that his father and mother were married in Victoria county in 1863, and after their marriage they lived in Guadalupe county about fifteen miles east of Seguin, the county seat, where witness was born. This witness remembered his half-sister Selama, but did not know whether she and Mrs. Guyer were half sisters or full sisters. He had heard that Selama was dead; must have been dead fifteen or twenty years. He identified Selama as having blue or gray eyes, light hair, light complexion. Witness had brown hair, which was the color of his father's hair. As he understood the family history, his father had been married once before and had two children by this marriage. Further describing his father, he said: "My father was quite an active man in the community out there. He did right

smart trading, an old farmer. * * * He was a man of considerable affairs, had some property, considerable property. * * * My father was a hard-working, industrious man. * * * He could write and he could read. * * * My father was not quite as tall as Hillary, I don't think but was taller than I am. I am five feet ten and a half. Hillary is about six feet two I think. According to my recollection my dad was somewhere in there between us two."

Of Selama and Mrs. Guyer he said: "I did not know anything about Mary Guyer and this other girl being half sisters. These lawyers never said anything to me about their not being sisters. * * * I don't know until yet but what they are sisters. They were full sisters was my thought."

Mrs. Goldman testified that she was a daughter of W. H. Green and Eliza Wakefield. She exhibited a picture of her father taken before he married her mother. The identity of Selama is most material in the identity of W. H. Green. On this issue appellants' witness, P. C. Cuahdoin, testified that he was fifty-six years old; had lived in San Marcos seven years; lived at Black Ankle thirty years; Black Ankle is sixteen miles southeast of San Marcos in Caldwell county. He knew a woman that lived in Black Ankle who claimed relationship to Mrs. Guyer, was Mrs. Guyer's sister; she was living with a Mexican. He was living there in 1898; he did not know what became of the woman. On cross-examination he testified that the Mexican left there in '88 and the woman stayed there a while longer. He said: "Probably she lived there until just before Christmas the year before; I had known them about a year; then he left and she stayed around a while and then she left; I don't know where she went; that was in 1898."

J. M. Pearman, on this issue, testified that he was born in Guadalupe county in 1856 and had lived about three miles from the home of W. H. Green all his life except one year. He knew William Green; he knew a daughter of William H. Green who married a Mexican and was living with a Mexican about 1874. At that time she was seventeen or eighteen or twenty years old. He did not know who told him about this woman; "that was just like other things circulated in the neighborhood; that she was Mr. Green's daughter and was married to a Mexican is all I know. * * * I don't know exactly when Mr. Green died. * * * '88 or '89, somewhere along there. That was before Mr. Green died. * * * I told you it was about '74 at first."

The following testimony reflects appellees' theory of the identity of Wm. H. Green, who married Mary Smith. Mrs. Raymond, Mary's half-sister, testified by deposition that she

was born in Jefferson county, Tex., in 1850; she knew Wm. H. Green, who married her sister Mary; he and Mary were very poor; he was shiftless and never worked but gambled and ran horses; he had very light hair, keen blue eyes, and was about five feet seven inches tall. She knew her neice Selama, the daughter of Mary. Selama lived in her home in 1880. Selama's husband was a man named Sassella. He abandoned her while she was living with the witness. After Selama was abandoned by her husband she continued living with witness for a short while and then went to Corpus Christi and from Corpus Christi to Laredo. Witness received letters from Selama written from Laredo. The last letter was in 1888 in which Selama stated she was very sick. She never heard from her neice again. She had never heard of any person who had seen or heard of her neice being alive after she heard from her in Laredo in 1888. The relations between witness and Selama were intimate. Selama told witness about her life and family. In 1880 Selama told her that her father, Wm. H. Green, was dead. Selama never mentioned that her father ever lived in Guadalupe county or Caldwell county, or any place in West Texas. Prior to this suit witness never heard of any claim on the part of Hillary Green and his brother and sister that their father, who lived in Guadalupe county, was the husband of Mary Smith. The picture of the Gaudalupe county W. H. Green this witness says was not the picture of her brother-in-law. Selama told her that Mary left two children; that after her mother's death she lived with her Aunt Rosa Smith. Selama told her that her sister was married; that she lived only a short while after she married. Her brother John B. Smith made several trips to Beaumont and East Texas after the Civil War. After one of these trips he returned home and told witness and other members of the family that Bill Green was dead. She testified further: "All I know about what country Wm. H. Green came from to the United States, he said he was Irish. * * * Never stated to me that he had any brothers or sisters. He said he had no relations. * * * During the Civil War Wm. H. Green visited that community twice. He came to our house after his wife died, stayed about a month. * * * After the war he came back the second time. He came to the community the first time near the beginning of the Civil War and the second time just after the close of the war. He told us on that visit about the two children and about his wife Mary Green being dead. * * * His last visit to Matagorda County was just after the war. * * * Selina Green Sassella, as I knew her, was a blond, tolerably light hair and I would call her eyes gray. She was about five feet two inches in height, plump but not overly stout."

Vene Granger testified that his sister Zelma married W. H. Green; one child was born of the marriage; he knew the child until she was seven or eight years old; after his sister's death Green left Louisiana, but returned for Mary and took her away when she was about thirteen or fourteen years old. He never saw her again; could not identify Mary Guyer as being his sister's daughter; said he thought his brother-in-law was American; spoke "American" altogether. "Mr. Green never said anything about whether he was married a third time when he was there, but he was after his children." His neice, when he knew her, was light-complexioned, with blue eyes and white hair. "This man Green that married my sister freighted in that country a while during the war. I think I stated on the other trial that he freighted around that country until after the war or maybe until about the end of the war. I think he did stay in that country until about the end of the Civil War. That is true." He testified that when his sister died the first one to take Mary was the Aunt Elizabeth. A short while before the father came and took her away she was in the home of her Uncle Joe Guidry. He was not able to recognize the picture of the Guadalupe W. H. Green as being the picture of his brother-in-law. "That picture they showed me as being Green was not the picture of the Green who married my sister. I didn't recognize it because when I knew him he had long beard and he was clean shaved when that picture was taken."

A. B. Smith, a nephew of Mary Green and a son of John B. Smith, testified that he was fifty-three years old; heard his father say that Wm. H. Green married Mary; said he did not know whether Green died in East Texas or not, but his father told him he did. "He said he died in Texas somewhere, I don't know where. * * * It has always been thought and said in my family that he died in East Texas. Prior to the time this suit was filed * * * I never heard of W. H. Green over in Guadalupe County, Texas. I never heard of their claim of being any relation to the W. H. Green who married Mary Green or any connection at all." This witness did not know Eliza Wakefield. "I heard something about W. H. Green other than what my father said about his being dead. My father said he wasn't any good; that he didn't work and that he didn't take care of his wife." This witness identified a letter dated June 2, 1877, written to his father by a Galveston lawyer saying that he was representing Mrs. Selama Zampini and Mrs. Sarah Barnes, nieces of John B. Smith, in an effort to recover their interest in Jefferson county land. John Moses Smith, a relative of W. H. Smith, testified that he first saw Mary Green in 1853 or 1854. Speaking of W. H. Green he said: "He run off. It

was told they accused him of stealing hogs. Well he run off and left her. That was his second wife, the Granger girl." He then proceeded to describe Green's treatment of his wife and children, saying: "When he run off to Texas his wife brought the children to us. Said she couldn't keep them. That was his second wife. * * * The neighbors were saying around there Green had run to Texas; accused him of stealing hogs. * * * I couldn't tell you where Green lived when he married this Granger woman. He was just straggling around the country. * * * I believe he was a kind of nocount fellow. When it would get too hot in one place, or where they would not give him anything, he would go to another place. I heard my mother say the poor woman would not have died if he had taken care of her; couple of little kids in a house boat."

Miss Elizabeth Vaughn testified that she was a relative of Mary Smith, but did not know Mary or her husband. "I never heard anything about them only he was dragging her around in an old sail boat when she died. * * * They didn't speak well of him at all; Mrs. Armstrong didn't, about him deserting the children. They just called him 'Old Green.' * * * I did not hear my Aunt say how long after his first wife, Mary Green, died before he married the other woman, but I think it was pretty soon. I know they talked bad about him; I couldn't tell you all they said but they didn't talk good about him. * * * I think he married this other woman right after his wife died. They sure didn't speak good of Green."

We think the testimony as summarized by us raises the issue against the identity of Wm. H. Green, as claimed by appellants. Appellants' Wm. H. Green was an upright, successful farmer, having the respect of his neighbors and a good man; the husband of Mary was as worthless as words could paint him, gambled, shiftless, cruel to his family, a wife deserter, a deserter of his children, accused of hog stealing. Appellants' Wm. H. Green was of French descent; Mary's husband was an Irishman who spoke only "American." Appellants' Wm. H. Green was at least six feet tall; Mary's husband was only about five feet seven inches tall. Appellants' Wm. H. Green died in Guadalupe county and was buried there in 1888; Mary's husband was dead in 1880 and by family tradition was buried in Eastern Texas, a different section of the state from Guadalupe county. Appellants' Wm. H. Green married in Victoria county in '62 and moved to Guadalupe county, where he made his home until his death; Mary's husband visited his Smith relatives in Matagorda county before the war and during the war and after the war, also; he appears to have been in Louisiana during the Civil War and until the close of the Civil War and at the time when appellants' Wm.

H. Green must have lived with his family in Guadalupe county. In this connection it is most significant against appellants' claim of identity that W. H. Green, in visiting his Louisiana relatives at the time he went after his children, never mentioned that he had married a third time, and in visiting his Matagorda county relatives after the Civil War talked with them about Mary, but did not tell them of his third marriage, a fact they never learned until this lawsuit started. Also the difference in the *character* of appellants' W. H. Green and Mary's husband made their identity impossible. Morally Mary's husband could not have been the man who married Eliza Wakefield.

Appellants have as much trouble with Selama as with W. H. Green. Her aunt identified Selama as being a guest in her home in 1880, living with her a while; going from her home to Corpus Christi and from Corpus Christi to Laredo; testified to a correspondence between them up until 1888 when Selama wrote that she was very sick, and never heard from her again. Selama told her aunt all about her prior life and about her father, but never mentioned the Green family in Guadalupe county. The Guadalupe Greens identify Selama as being with a man named Johnson, as living at Black Ankle, about six miles from their home, with a Mexican. The testimony of appellants, together with the testimony of appellees' witness Pearman, keep Selama in Guadalupe county at least as late as 1888. Pearman testified to a knowledge of Wm. H. Green's daughter who married the Mexican beginning in '74 and continuing up to '78. The Selama who married the Mexican and lived at Black Ankle could not have been the neice of Mrs. Raymond.

All exceptions against the submission of question No. 1 are overruled.

■ The court did not err in refusing appellants relief under the Hardin county judgment of September, 1925, in favor of the heirs of P. O. Brousan against the unknown heirs of Mary Smith. Prior to the institution of that suit the plaintiffs therein filed suit in the District Court of the United States for the Eastern District of Texas against these appellees to recover a one-fourth interest in the 1,808 acres. This suit was styled Andrus v. Hutchinson, the opinion of the Circuit Court of Appeals therein being reported in 17 F. (2d) 472. While the federal court suit was pending the Hardin county suit was filed and prosecuted to judgment, and on the subsequent trial of the federal court suit the plaintiffs therein offered in evidence their Hardin county judgment, which was correctly excluded, as shown by the opinion of the Circuit Court of Appeals, on the ground that it was rendered subsequent to the date of ouster plead by the plaintiffs in their federal court suit. The ruling of the court in this

respect was affirmed on appeal. We quote as follows from that opinion: "The land in question was patented to the heirs of Wm. H. Smith, and plaintiffs in error claim title, first, through a conveyance from Mary Green, one of the said heirs, executed in 1850; second, through a judgment obtained in the district court of Hardin county, Tex., rendered September 12, 1925; and, third, by the statutes of limitations of 3, 5, 10, and 25 years. Defendants deraign title through the heirs at law of the same Mary Green, and also rely upon possession under the statutes of limitation of 3, 5, 10, and 25 years."

■ It thus appears that between the heirs of P. O. Brousan and these appellees it was finally adjudicated in that case that these appellees hold under the true heirs at law of Mary Green. That conclusion of fact was binding upon all parties thereto in all subsequent litigation where the question of heirship was at issue. Hanrick v. Gurley, 93 Tex. 458, 54 S. W. 347, 55 S. W. 119, 56 S. W. 330. When appellants filed their Hardin county suit against the unknown heirs of Mary Green they knew of appellees' claim, under and through her heirs at law. In fact, as just stated, as between these parties, it was judicially decreed by the federal court judgment that appellees held under the heirs of Mary Green, thereby, as between these parties, vesting appellees with all the title to this land. It follows therefrom that appellants acquired no title by virtue of their Hardin county judgment, for it is the law that an owner in actual or visible possession of his land is not bound by a judgment against unknown owners; that is to say, when the actual owner is in possession a judgment against unknown owners is void as to him and in no way casts a cloud on his title. Griggs v. Montgomery (Tex. Civ. App.) 22 S.W.(2d) 688, and authorities therein cited.

■ For the following additional reasons the Hardin county judgment can afford appellants no relief: (a) The date of ouster alleged in the federal court suit was January 1, 1924. The same date was alleged for the ouster in the Hardin county suit. Thus it appears affirmatively on the face of the record in the Hardin county suit that the title upon which appellants recovered therein was the same title put in issue by their federal court suit; that is to say, the record affirmatively excludes any presumption that appellants recovered in the Hardin county suit upon a title acquired subsequent to the institution of the federal court suit. Collins v. Ballow, 72 Tex. 330, 10 S. W. 248. No one could deny the proposition that by the judgment in the federal court appellees acquired all title owned by appellants at the time that suit was instituted. From this it follows that the Hardin county judgment did not create in the plaintiffs therein a new title, but was only a judicial decree that the title owned by

them on the 1st day of January, 1924, was superior to the claim of the defendants, the unknown heirs, which title was lost to appellants herein and became vested in these appellees by virtue of the federal court judgment. (b) Article 7391, R. S. 1925, is as follows: "Any final judgment rendered in any action for the recovery of real estate shall be conclusive as to the title or right of possession established in such action upon the party against whom it is recovered, and upon all persons claiming from, through or under such party, by title arising after the commencement of such action."

Under the literal language of this article the force of the federal court judgment was to vest in appellees whatever title appellants acquired under their Hardin county judgment. Against this construction of this article, or rather, as they put it, against this construction of the federal court judgment, appellants say: First. The Hardin county judgment was interlocutory, and, therefore, its ultimate effect was not in issue in the federal court case. As between the appellants and the unknown heirs of Mary Green, the Hardin county judgment was interlocutory for two years, but as between third parties, citing Fowler v. Hardee (Tex. Civ. App.) 16 S.W.(2d) 154, appellees deny this proposition. We do not decide this point, since it is not controlling on any proposition involved, for, whatever may have been the nature of the judgment against the unknown heirs when the federal court case was tried, it ultimately became a final judgment, and as such had full force and effect as and from the date of its rendition. Therefore, all the right, title, claim, and interest owned by appellants under that judgment related back to the date of its rendition. This proposition is supported by Ewing v. Wilson, 63 Tex. 88, where it was affirmatively decided that the party losing in a judgment in trespass to try title is precluded thereby "from ever asserting title through any fact which existed on the *day* the judgment was rendered." Second. Appellants say appellees are estopped to deny the force and effect of the Hardin county judgment because they objected to its introduction in the federal court trial. There is no merit in this contention. This judgment was properly excluded, because, subsequent to its rendition, appellants did not amend their federal court pleadings by alleging an ouster as of date subsequent to the rendition of the Hardin county judgment. For this reason this judgment was lost to appellants because of a defect in their pleadings. Freeman v. McAnnich, 87 Tex. 132, 27 S. W. 97, 47 Am. St. Rep. 79; Moore v. Snowball, 98 Tex. 16, 81 S. W. 5, 66 L. R. A. 745, 107 Am. St. Rep. 596.

■ As a complete answer to appellee's claim under the federal court judgment, appellants say it was absolutely void on the ground that

that court was without jurisdiction of the parties, which fact, they say, appears affirmatively on the face of the record therein. On the facts under this proposition we think the most that can be said is that the face of the record does not affirmatively show jurisdiction, and not, as appellants assert, that the lack of jurisdiction appears affirmatively on the face of the record. That the federal court may have erroneously assumed jurisdiction on the ground that diversity of citizenship was not shown did not make its final judgment void. While erroneous, such a judgment is binding unless set aside on appeal. Des Moines Navigation & R. Co. v. Iowa Homestead Co., 123 U. S. 552, 8 S. Ct. 217, 31 L. Ed. 202; Dowell v. Applegate, 152 U. S. 327, 14 S. Ct. 611, 38 L. Ed. 463; Chesapeake & Ohio Ry. Co. v. McCabe, 213 U. S. 207, 29 S. Ct. 430, 53 L. Ed. 765; United States to Use of Hine v. Morse, 218 U. S. 493, 31 S. Ct. 37, 54 L. Ed. 1123, 21 Ann. Cas. 782; Ex Parte Harding, 219 U. S. 363, 31 S. Ct. 324, 55 L. Ed. 252, 37 L. R. A. (N. S.) 392; Clayton v. Hurt, 88 Tex. 596, 32 S. W. 876.

Since the judgment of the lower court must be affirmed for the reasons already stated, it is not necessary that we make an extended review of the evidence in support of the jury's verdict on the issue of ten years' limitation. Taylor's bayou crosses the southwest corner of the 741 acres in which appellants claim their undivided interest. Only a small parcel of this tract lies south of the bayou; appellees suggest about 15 acres. It is our conclusion that there is some evidence sufficient to carry the issue to the jury that all the land north of the bayou was under fence by one Hayes for more than ten years prior to the filing of this suit. The testimony raised the issue that Hayes fenced this land under authority from appellee Guy Junker and as his tenant, and, while the land was so under fence by him, held it in recognition of his tenancy under Junker. The evidence also raised the issue that Junker, in making this tenancy contract with Hayes, was representing the plaintiffs, or those holding under them, in the partition judgment of 1899, and that, in holding the land under Junker, Hayes, in fact, was holding it, not only for Junker, but in recognition of the claim of the plaintiffs in the partition judgment of 1899. Appellants' contentions are: (a) That there was no evidence that this land was inclosed for ten years; (b) that there was no evidence that Hayes held under Junker or in recognition of and under the title of the plaintiffs in the judgment of 1899; and (c) that there was no evidence that the holding under Junker was adverse to the unknown heirs of Mary Green, who, they say, were in fact his cotenants. There is no proposition that the judgment is so against the great weight and preponderance of the

testimony as to be clearly wrong. From the conclusion just stated it follows that all these propositions must be denied.

As we understand appellants' argument, their most serious legal contention is that Junker's holding was not adverse to the unknown heirs of Mary Green. The issue was raised that the plaintiffs in the partition judgment of 1899, together with the defendants therein who held under the plaintiffs, claimed all the interest in this land. The 741 acres awarded to the plaintiffs therein was claimed by them as against the world. There was no suggestion in the pleadings in that case that they recognized any adverse title or cotenancy in any other person. The issue was raised that subsequent to the rendition of the judgment the plaintiffs and those holding under them claimed all the interest in the 741 acres. As we understand the law of Texas, on the facts just stated, the partition of this land among the parties to the 1899 judgment was a notorious act of ouster, sufficient, when the parties to that judgment took actual possession of the land, to visit all adverse claimants with notice thereof. In Cryer v. Andrews, 11 Tex. 181, it was directly held by the Supreme Court that a partition decree "was a notorious act of ouster * * * it would * * * operate as the commencement of prescription in favor of all who held adversely, under such decree; and possession under it, accompanied with the circumstances enumerated in the statute, would ripen into a bar against a joint owner thus disseized." In Honea v. Arledge, 56 Tex. Civ. App. 296, 120 S. W. 508, 511, it was said: "It is difficult to conceive of an overt act more notorious in character, and more clearly indicating a purpose to appropriate the common property to the exclusion of another joint owner, than was evidenced by the partition proceedings instituted by the heirs of Wm. Arledge, and their subsequent use of their respective portions."

Appellants are correct in their proposition that a cotenant who enters under deeds to undivided interests would not be in hostile possession against his cotenants in the title claimed by him. Noble v. Hill (Tex. Civ. App.) 27 S. W. 758. But that proposition does not control these facts in support of appellants' proposition that no ouster was shown. Junker and those under whom he holds did not recognize a cotenancy in the partition judgment. Thus it is made clear that in conveying this land the plaintiffs in that judgment intended to convey all of it, and in taking possession of it Junker, for himself and for his cotenants under that judgment, took possession of all of it, hostile to the claim of all parties not holding under that judgment. This conclusion has support in Merriman v. Blalack, 57 Tex. Civ. App. 270, 122 S. W. 409.

■ The issue of constructive possession is not in the case in so far as the land north of the bayou is concerned. This is so because appellees had actual possession of all of this part of the land in controversy holding the same under inclosures. As to the small tract of land south of the bayou, we think the issue of hostile possession and claim for the necessary period of ten years was duly raised. There is no question as to this issue subsequent to 1920. Prior to 1920, for a sufficient length of time to make the ten years, appellees were in possession of this small tract of land, in that a tenant of theirs had a sawmill thereon. The sawmill was erected possibly about 1917 and was operated continuously, except for a period of about one year. During a portion of that time also some of the houses built on this land for the use of the sawmill hands were occupied. We think, under the principle announced in Whitehead v. Foley, 28 Tex. 1, the character of these improvements, together with their use, was sufficient to mature the statute of ten years' limitation as to the land south of the bayou.

For the reasons stated the judgment of the trial court is in all things affirmed.

### On Rehearing.

PER CURIAM.

On rehearing appellants complain that we overruled without discussion their eighth and tenth propositions under subdivision (b) of their brief, which are as follows:

"Eighth Proposition.

"The trial court was in error in definition in the charge as to 'possession,' wherein the jury were told: 'A possession by one who holds in recognition of the title of another is in law the possession of such other person.'"

"Tenth Proposition.

"It was error in the trial judge to refuse Appellants' Requested Charge No. 7 to the effect that no limitation could run in behalf of defendants during the time covered by the suit instituted by Junker and others against these appellants from the 24th of January, 1928, to June 21, 1928."

They also insist that our conclusions of fact upon the issues discussed are wholly without support in the evidence. We gave no quotation from the testimony in support of our conclusions on the issues of limitation. Nothing further could be added in support of our conclusions on the other issues.

Appellees have answered to our entire satisfaction appellants' propositions attacking our conclusions on the issues of limitation by quoting from the statement of facts the testimony upon which these conclusions must rest. Also, appellees have answered by citation of authorities directly in point appellants' propositions, that the court erred in its definition of possession and in the refusal of requested charge No. 7. After reviewing carefully in consultation this argument of appellees, we adopt it as our opinion on rehearing:

■ "The first challenge is to the conclusion of this court that there is evidence sufficient to carry the issue to the jury that all the land north of the bayou was under fence by one Hayes for more than ten years prior to the filing of the suit. Such finding is fully justified by the evidence.

"The witness Hayes traced the outline of his pasture known and referred to as the Thomas pasture. He described the character of the enclosure. The fences built by him completing the enclosures and dividing the pasture into two portions were constructed in January or February 1918. Plaintiffs' suit was filed in June, 1928. With the construction of his fences in January or February 1918, the pasture was divided into two parts, one part known as the 'big pasture' and the other as the 'catch pasture.' The fences or barriers forming the lines of his enclosure as outlined by the witness, turned cattle and would keep the witness' cattle within the enclosure and keep outside cattle without the enclosure. That from the time of the enclosure in January or February 1918 to the summer of 1929, the witness always had one hundred head of cattle or more in the pasture, and sometimes had as many as one hundred forty and one hundred fifty head of cattle, and during that time he at all times used the enclosure as a cattle pasture. That after the construction of the fences, the witness kept the fences in repair.

"Witness George Blanch testified that he fenced the land south of the bayou in the fall of 1919, and at that time he found the fence constructed by Hayes north of the bayou, and joined a fence constructed by the witness to the Hayes fence. That he understood that the land within the enclosure of the fence was the Thomas pasture. That Hayes had cattle in the pasture and that Hayes was trying to keep his fences in repair. That after the witness went there that he placed his stock in the pasture north of the bayou and they stayed there until he went and got them. That he had some cattle there at all times. That he had cattle there ever since 1920 and still had them there at the time of the trial.

"It is true that some of the witnesses testified that the land was not enclosed but cross examination developed that the witnesses were not familiar with the ground, but however that may be, the issue was found by the jury in favor of the defendants and evidently accepted the testimony of Hayes and

Blanch, which testimony is in accord with the actual facts.

"Appellants next challenge the statement of the court to the effect that the testimony raised the issue that Hayes fenced the land under authority from appellee, Guy W. Junker and as his tenant, and while the land was so under fence by him held it in recognition of his tenancy under Junker.

"Witness Hayes testified that when he moved down there in November, 1917, that he went to Mr. Junker and asked about fencing the land down to the bayou, and Mr. Junker told him he could do it and to go ahead. Witness further testified that he 'entered and held it (the land) under the authority and control and in recognition of Mr. Junker.' He further testified that Mrs. Thomas, his mother-in-law whose land was also within his enclosure held her title to her land under the judgment in the case of John B. Smith et al. v. A. E. Broussard. That before seeing Mr. Junker, he discussed the matter with his mother-in-law who told him not to fence it without permission and he went to see Mr. Junker and asked permission and he gave it. On cross-examination, the witness said that he did not pay Junker anything for the privilege, that Mr. Junker never asked for anything, but had he asked for anything witness would have tried to pay him. That the use that he made of the Junker land was valuable to the witness as a pasture.

"Mr. Guy W. Junker testified that Hayes came to him and stated he wanted to build some fences on the land and wanted to use the land north of the bayou for a pasture, and that he gave 'him permission to build that fence and use that land.'

"Appellants next challenge the statement of the court to the effect, 'the evidence also raised the issue that Junker in making his tenancy contract with Hayes was representing the plaintiffs, or those holding under them in the partition judgment of 1899, and that in holding the land under Junker, Hayes in fact was holding it not only for Junker but in recognition of the claim of the plaintiffs in the partition judgment of 1899.'

"Junker testified that he was a party to the suit of 1899 and acquainted with the suit and its parties; that in the judgment there was set aside to him 123 acres and he had acquired from the other parties to that judgment through mesne conveyances, title to all of the land in suit; that his negotiations to purchase extended back to 1910; that during the time of his negotiations that he had looked after the land for the various owners holding under the judgment and that when he leased the land he had all of same under control. That prior to the time of his various purchases, he was not claiming, by reason of his possession, the land as his own, except

as to that which he had purchased, and that his possession and the possession of those to whom he had leased was the possession of Masterson and the people who got that judgment and their successors in title; that he did not remember exactly how long the original people who got the judgment owned it, 'but it went into the hands of other parties whom I represented also. I was holding it for those parties.' The witness further testified that he and those for whom he held, claimed to own all the land under the judgment of 1899; that as to what he himself did not own, he had the land under his control and was using it, holding and claiming it, for the persons he recognized as the owners under said judgment. That in the taking of the possession of the property as a representative of the other owners with him under the judgment that, 'I recognized the ownership of the people who got that judgment as the owners of that property.' That some of it went into hands of other parties other than the original parties to the judgment whom the witness also represented and for whom he was holding.

"Of course, the rule is that an owner may be in possession through an agent as well as by tenant. Huff v. Crawford, 88 Tex. 374, 30 S. W. 546, 31 S. W. 614, 53 Am. St. Rep. 763, and that the tenant who went in under the agent became the tenant of the owner whom the agent represented. Bowles v. Brice, 66 Tex. 728, 2 S. W. 729; Cobb v. Robertson, 99 Tex. 138, 86 S. W. 746, 87 S. W. 1148, 122 Am. St. Rep. 609.

"It was shown that Junker and those for whom he held and under whom he held claimed to own the land under the true heirs of Mary Smith. The persons to whom the land was partitioned under the judgment of August 3, 1899 claimed the land set apart to them as being entitled thereto as the true heirs of Mary Smith and W. H. Smith. That Junker and the people under whom he held, 'claimed to own under the true heirs of Mary Smith as evidenced by that judgment.'

"It is further shown that Junker and those under whom he holds as to the land in suit, has paid all taxes thereon since the time of said judgment in 1899 and constituting a period of thirty years.

"All that is required by the limitation statute is 'an actual and visible appropriation of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another.' Payment of taxes is in itself, evidence of claim. Baker v. Fogle, 110 Tex. 307, 217 S. W. 141, 219 S. W. 450; Bishop v. Paul (Tex. Civ. App.) 217 S. W. 437.

"Appellants attack the holding of this court that, 'the issue was raised that the plaintiffs in the partition judgment of 1899,

together with the defendants therein who held under the plaintiffs, claimed all the interest in this land. The 741 acres awarded to the plaintiffs therein was claimed by them as against the world. * * * The issue was raised that subsequent to the rendition of the judgment the plaintiffs and those holding under them claimed all the interest in the 741 acres.'

"In addition to what the court says in its opinion as to the judgment of 1899 being a notorious act of ouster, we suggest that had said judgment not existed, the issue would have been raised as a matter of fact for the jury. This is demonstrated by the authorities cited by appellees themselves, to-wit, the case of McCoy v. Long et al. (Tex. Com. App.) 15 S.W.(2d) 234; Arrington v. McDaniel (Tex. Com. App.) 14 S.W.(2d) 1009 and is also sustained by the case of Illg v. Garcia, 92 Tex. 251, 47 S. W. 717, 718. In the latter case it was claimed that one relying on adverse possession could not claim against a cotenant unless the occupant has brought home notice of his claim as against his cotenant directly to said cotenant. The court speaking, said:

" 'Certainly, repudiation of the claim of a co-tenant, and notice thereof, may be shown by circumstances.'

"In the case of McCoy et al. v. Long (Tex. Com. App.) 15 S.W.(2d) 234, 235, Judge Speer uses language, if strictly construed without reference to the facts, might lead to the conclusion (for the moment waiving the effect of notice of the judgment of 1899) that the cotenant to claim by limitation against another cotenant would have to bring directly home by personal notice the fact of the claim, but reading further in the opinion, it will be noticed that the claim being made, which Judge Speer denied, was that the evidence showed as a matter of law there was adverse possession by one cotenant against the other. The Commission of Appeals held against the contention and held that in the absence of direct notice to the cotenant it was a question of fact for the jury to say whether or not the adverse possession in that case by a cotenant was adverse to another cotenant. The court said:

" 'Mrs. McCoy, being a cotenant with the plaintiff, her possession thereunder would not be *necessarily adverse*. The Court of Civil Appeals was right in holding, under the facts in this case—considering the long actual possession and all other surrounding circumstances—that it was a question of fact whether the defendant's possession had been adverse to the plaintiff's right.'

"The trial court submitted the issue of adverse possession to the jury and it was found favorable to appellees.

"The very first ground in appellants' motion for rehearing is that this court erred in that it has refused to pass upon assignments of error touching limitation.

"As we construe the court's opinion, the court in its discussion of the question, directly passed on all of appellants' propositions with the exception of the Eighth and Tenth propositions under 'B' of their brief. The court was correct in not considering appellants' Eighth proposition under 'B' of their brief relating to limitation, wherein complaint is made of the fact that the trial court erred in instructing the jury that, 'a possession by one who holds in recognition of title of another is in law the possession of such other person.'

"The objection made by the appellants in the court below did not in any wise attempt to point out the objection to the charge, but simply was to the effect, 'that plaintiffs object to the following definition of possession in the court's charge: A possession by one who holds in recognition of the title of another is in law the possession of such other person.'

"The above quoted is the complete objection to that portion of the court's charge complained of in the Eighth proposition and an objection not pointing out the defect in the charge, is in law, no objection at all.

"The Supreme Court in the case of Isbell v. Lennox, 116 Tex. 522, 295 S. W. 920, in very clear language states the rule. The objection to the charge in that case was:

" 'The plaintiffs except and object to the court giving, in charge to the jury, the following portions of the charge, to wit.'

"Then followed a quotation of the portion of the charge to which the objection was aimed. After quoting the statute relating to objections, the Supreme Court said:—

" 'This statute was designed to correct a very important handicap or evil in the trial of cases. Its purpose in requiring the parties or their attorneys to present to the court their objections to the charge clearly is that the party objecting must apprise the court of the error in his charge with a view to its correction.

" 'The objection must point out to the court the error complained of. If it fails to do that, it does not meet the purpose and requirement of the statute, and is no objection at all.

" 'The necessary and only construction that can be given to the language of the article is that it requires of a party more than a mere statement that he objects; *it must point out the error.* Any other construction would destroy its effect and make it meaningless. The gateway would be thrown open for the creeping in of the evils of the old practice when no objections were required, and the trial judge at his peril and under the pressure of his docket was required to prepare and give his charge without the benefit of the

assistance of counsel in the case, who were especially prepared on the law of the case, and who were permitted to make use of any flaw or error that might thereafter suggest itself if the verdict went against him.

. "'In the case of Gulf, T. & W. Ry. Co. v. Dickey, 108 Tex. 127, 187 S. W. 184, this court, through Chief Justice Phillips, said:

"'"The three articles, that is, amended Arts. 1970 and 1971, and unamended Art. 1972, in our opinion simply mean that in order to obtain a review of the general charge of the court on the appeal because of any error therein, an objection to the charge *in the particular complained of* must be presented to the trial judge before the charge is read to the jury."'

"See, also, Norwich Union Indemnity Co. v. Wilson (Tex. Civ. App.) 17 S.W.(2d) 79; Farmers' & Mechanics' National Bank v. Marshall (Tex. Civ. App.) 4 S.W.(2d) 167.

▋ "As to the Tenth proposition under 'B', the same is without merit as shown by the authorities in support of appellees' counter proposition set out on page 122 of the brief.

"In addition to those authorities, we call the court's attention to the case of Gibbs et al. v. Lester (Tex. Civ. App.) 24 S.W.(2d) 527, which is directly in point and contrary to the position of appellants.

"We have not attempted any discussion in this brief reply but have only tried to set forth in a brief way, evidence concerning the issues which appellants say have no evidence to support the same."

Motion for rehearing is in all things overruled.